## Wytheville.

### PORTER ET ALS. v. PORTER ET ALS.

### June 16th, 1892.

1. SANITY—*Burden of proof—Rules.*—"The legal presumption is that all men are sane, and the burden of proof is on him who alleges unsoundness of mind in an individual." *Miller* v. *Rutledge,* 82 Va. 867. "Mere weakness of the understanding is no objection to a man's disposing of his own estate." *Beverley* v. *Walden,* 20 Gratt. 147. "The testimony of witnesses present at the *factum* is more to be relied on than the opinion of witnesses based upon facts which may be true, and yet not be the result of unsoundness of mind." *Ibid.* 147.

2. DEEDS—*Unsoundness of mind—Undue influence—Case at bar.*—In case here the evidence establishes the grantor's competency and the absence of undue influence, and the fact that the value of the property conveyed was not more than an adequate compensation for the services rendered by the grantee to the grantor:

HELD:
   The decree establishing the deed should not be disturbed.

3. IDEM—*Innocent purchasers—Case at bar.*—Property conveyed by the deed claimed to have been executed under undue influence, having been advertised for sale by the grantee for two years, without any objection from those adversely interested, and without notice of their claims to the innocent purchasers:

HELD:
   The deed must stand in favor of those purchasers, whether it was or was not executed under undue influence.

Argued at Richmond. Decided at Wytheville. Appeal from decree of circuit court of Fauquier county, rendered January 11th, 1890, in the chancery cause wherein Mary Porter's heirs were complainants and Mary Ann Kirkman and others were defendants. The decree being adverse to the complainants, they appealed. Opinion states the case.

*Brooke & Scott* and *R. R. Campbell,* for appellants.

*Jeffries & White, A. D. Payne,* and *E. J. Rixey,* for appellees.

FAUNTLEROY, J., delivered the opinion of the court.

The original bill was filed in August, 1888, to obtain a decree setting aside and vacating a deed executed on the 30th day of September, 1882, by Mary Porter, to her niece, Mary Ann Kirkman, on the alleged ground that the grantor, the said Mary Porter, was subjected to undue influence by the grantee, the said Mary Ann Kirkman ; and, furthermore, that she was not *compos mentis* at the time of the execution of the said deed.

The amended bill alleges no new matter, and only makes new additional parties defendant.

The appellee, Mary Ann Kirkman, in her answer, denies all the material allegations of the bill, and especially that the said Mary Porter was, as alleged in the bill, weak-minded, insane, or under undue influence when she executed the deed aforesaid.

Mary Ann Kirkman, the grantee in the deed of September 30th, 1882, from Mary Porter, sold and conveyed the real property, consisting of a house and lot of comparatively small value, which she had thereby derived from the said Mary Porter, to H. H. Spindle and Charles W. Rosenberger, by a deed dated on the ―― day of ―――, 1888—six years after the date of the said deed from Mary Porter, and two years after the death of the said Mary Porter.

H. H. Spindle and C. W. Rosenberger demurred to and answered the bills. In their answer they deny the allegations of mental incapacity of Mary Porter, and undue influence by Mary Ann Kirkman over the mind and will of the said

Mary Porter, as charged in the bills. And they aver the performance, fully and faithfully, by Mary Ann Kirkman, of her covenant to support and maintain the grantor in the deed of September 30th, 1882, (Mary Porter,) which is likewise averred in the answer of the appellee, Mary Ann Kirkman. Spindle and Rosenberger also aver that they purchased and paid for the property conveyed to them by Mary Ann Kirkman, without any knowledge or notice of the claim set up by the complainants in their bills.

The deed in controversy, " made and entered into the 30th day of September, 1882, between Mary Porter, of the first part, and Mary Ann Kirkman, of the second part—witnesseth :

" That the said party of the first part, for and in consideration of the love and affection that she bears to the party of the second part, who is her niece, and for the further consideration of her kindness and attention to her, the said party of the first part, heretofore, and the promise and obligation hereby entered into by the said party of the second part, to care for, maintain, and support, during the residue of her natural life, the said party of the first part, doth, by these presents, give, grant, bargain, sell, convey, lease, and release to the said Mary Ann Kirkman, party of the second part, all the real estate owned by said party of the first part, in the town of Warrenton, Virginia—viz., a dwelling-house and lot on Culpeper street, in said town ; and tenement house and lot attached, opposite the Episcopal church, &c.—to have and to hold the property hereby conveyed to the said Mary Ann Kirkman and her heirs forever, with general warranty.

" Witness the following signatures and seals, this day and year first above mentioned :

" Mary ⋈ Porter, [Seal.]
her      mark.

" Mary A. Kirkman, [Seal.]

" Teste : *A. D. Payne.*"

Mary Porter, who was aged, infirm, and requiring constant and assiduous care and attention, lived until June 20th, 1886 ; and the uncontradicted evidence in the record shows that Mary Ann Kirkman, her niece and namesake, fulfilled her contract, in the letter and spirit, for the care, maintenance, and comfort of her invalid aunt, up to the time of her death and burial, thereby rendering a valuable and full consideration for the property conveyed by the deed in question, which was sold by Mary Ann Kirkman to Spindle and Rosenberger for $2,000, after two years' advertising and diligent efforts to sell it by Capt. A. D. Payne, an able and eminent member of the Warrenton bar, aided by two real estate business firms employed by him for that purpose.

H. H. Spindle and C. W. Rosenberger purchased the said property for value, without notice of any pretended claim of appellants, by reason of insanity, undue influence, or otherwise. An advertisement for sale of the said property was inserted and kept standing in a newspaper published in the town of Warrenton for over two years; and though Mrs. Booth, the real and active litigant among the appellants, lived in the town of Warrenton, yet she failed to give any notice to the public which would even tend to deny the right of Miss Kirkman to sell the property in question, and failed to institute suit to annul the deed of September 30th, 1882, for more than six years from the execution and recordation thereof; and failed to notify Spindle and Rosenberger, the purchasers, of her pretensions, until after they had purchased and paid for the property, and had sold and conveyed a part thereof to Miss Pollock, an innocent purchaser for value, without notice.

There is no proof in the record of notice to or knowledge by the purchasers, Spindle and Rosenberger, of the claim, or grounds of claim, of the appellants, at and before the deed of 1888 from Mary Ann Kirkman to them, and the payment of

the purchase-money by them; and even though it were established by proof that on the 30th day of September, 1882, Mary Porter was not mentally competent to make the deed of that date, or that she was unduly dominated by the strong mind and will of Mary Ann Kirkman, in the absence of proof of notice to or knowledge by Spindle and Rosenberger, before conveyance and payment of purchase-money, no decree can be entered that can affect the title of Spindle and Rosenberger or their grantees, who have placed thereon valuable improvements. Failure of notice on the part of appellants has caused other equities and rights to supervene; and a court of equity will not subject innocent parties to loss or vexation, when they acquire their rights in total ignorance of any apparent, or even imaginary, defect of title to property, and have placed valuable improvements thereon. The only attempt at proof of notice to the purchasers, Spindle and Rosenberger, is the statement of Mrs. Agnes E. Booth, the chief appellant, that she made no attempt to stop or question the sale of the property by Mary Ann Kirkman, the owner of the property for over six years, and the advertiser of it for over two years, in her town paper; but that she did notify Dr. Hicks that purchasers of the property could not get a good deed—though she does not say why they could not get a good deed.

It is a familiar and well-settled rule of law that " the legal presumption is that all men are sane; the burden of proof is on him who alleges unsoundness of mind in an individual." *Miller* v. *Rutledge*, 82 Va. (Hansbrough) 867. "Mere weakness of the understanding is no objection to a man's disposing of his own estate." Minor's Institutes, 572. See *Samuel* v. *Marshall*, 3 Leigh 567; *Greer* v. *Greers*, 9 Gratt. 332–'3; *Beverley* v. *Walden*, 20 Gratt. 147.

" The testimony of witnesses who were present at the *factum* is more to be relied on than the opinion of other witnesses based upon facts which may be true, and yet not be

the result of unsoundness of mind." *Beverley* v. *Walden*, 20 Gratt. 147. •

Captain A. D. Payne wrote the deed in question, and he testified: "I knew Miss Polly Porter (as we called her) intimately. I have known her since she came to this town to live, which, I think, was about 1855. * * * Miss Polly Porter, * * * the latter part of the year 1858, gave me the first piece of professional business I ever had. I continued to act as her counsel from that time until a year or two before she left the town. Of course I saw but little of her during the war. I lived at my father's house * * * until the 1st of January, 1869. Miss Polly Porter, during that time, was extremely intimate with my father's family; was at the house almost every day, and took her meals very frequently; went in and out almost with the familiarity of a member of the family. During that time I had abundant opportunities of knowing her, and I continued to see a great deal of her until her sickness in 1882. Miss Polly was not an educated woman, in a high sense of the word; but I always thought her of more than common intelligence and vigor of mind. She was very shrewd and keen in a bargain, and sensible, I always thought, in her views of things and people. She was what might be called eccentric, and a woman of strong prejudice; but I thought her always entirely competent to transact any business."

Captain Payne, after stating that in July, 1882, some weeks after Miss Polly Porter was taken sick, he received a message from her that she wanted to see him on business, in consequence of which he went to her house, and was ushered into her sick room, says: "She recognized me instantly, extended her left hand (the one nearest to me), and asked me to take a seat. I sat down. We had for some minutes some conventional talk. She asked me how my wife and children were, and I expressed my regret to find her so unwell. In a

little while I told her I had received her message, and was there in obedience to it. She told me yes, she had sent for me, and was very anxious to see me about a matter that gave her great concern. * * * Miss Polly said to me on this occasion, in substance, that she wanted to talk about making her will; that a will had, a short time before, ' been made for me in favor of a person ' (and I am using her words, for I remember her using the word '*person*,' and was struck with it at the time) who had proved unworthy of her affection; that she had found out, from her taking certain property of hers without her consent, that all she wanted was her property. She mentioned some articles that had been taken from her. * * * She said she had determined to change her will, and had sent for me to write. * * * When Miss Polly asked me to write her will, then and there, I made some excuse (about being obliged to go to my office) until I could have [an interview] *a review* with Dr. Ward, who was her physician, and others who had seen her, to ascertain their view of her mental condition, and to have them present at the time the will was made—if it was to be made—and to have their assurance at the time the will was made of her soundness of mind. * * * I made the arrangement that Dr. Ward was to name the hour, and was to be present when the will was written. I also procured the attendance of Mrs. Richards Payne and Miss Catharine Williamson, old neighbors and friends of Miss Polly, and who had seen her frequently during her sickness. * * * We four met by appointment in the front room of Miss Polly's house—the parlor—and I requested Dr. Ward, Mrs. Payne, and Miss Williamson to go into Miss Polly's room and talk to her, and inform themselves, by all methods that they knew, of her mental condition at that time. They went into the room and staid some time, and came out and informed me that she was perfectly rational, sound of mind—as much so as they ever knew her in their lives. This coincided entirely

with my own judgment of her condition. A table, pens, and ink and paper were then brought me, and I sat down in the parlor, close to the folding-doors, and in sight of those who were in Miss Polly's room, and wrote the will which is filed as an exhibit with Mrs. Richards Payne's deposition. Miss Polly had previously told me how she wanted her property disposed of. She said that although her brother Lewis, Col. Porter, protested against being made a beneficiary under her will, she, nevertheless, had determined to make him one of her devisees. I wrote the will according to her desires as expressed, carried it into the room, read it to her in the presence of those of whom I have spoken, asked her if it carried out her intentions. She said it did. I asked her if she acknowledged it as her last will and testament. She said she did. And when I asked her to sign it, she said that she was so feeble, and lying on her back (which was true), that she could not well sign it without being propped up in bed; and, as she was a large, corpulent woman, this would worry her a good deal; and asked if some one could not sign it for her. I said yes; and asked her if I should sign her name. She directed me to do so, which I did. She acknowledged the will, and asked Dr. Ward to attest the signature. Then Mrs. Payne and Miss Catharine Williamson, they being together at the same time, in Miss Polly's presence, and at her request, attested the will as attesting witnesses. From that time until Miss Polly left for Culpeper Courthouse, in the month of October of that year (1882), I had a good many interviews with her, principally about the will that was outstanding—the first will—and the property which she said had been taken from the house. She informed me that one of the bonds, which had been taken, or was in the possession of Mrs. Booth, was the bond of her husband, Mr. Booth. \* \* \* She still continued very uneasy about the first will; she stated to me that she had made an effort to get the will, and couldn't

·do it.    Finally, at one of my interviews with her, she told me that the town and her place were very distasteful to her, and she didn't want to live there any longer; and that she had made up her mind to go to Culpeper Courthouse, and spend the balance of her days with her two nieces, the Misses Kirkman, who were most kind and considerate of her, and who had invited her to live with them; and that she had determined, in consideration of this invitation and kindness on their part, to change her will again, and leave her property to Miss Mary Ann Kirkman.    She seemed to think, to leave her property to Miss Mary Ann Kirkman would be equivalent to leaving it to both, because they were old maids and lived together.    She said she did this because her brother, Colonel Porter, had positively refused to have anything to do with her property, and didn't want any of it.    It was I, I think, that suggested to her then that, in the disposition of her property, to put it in the form of a deed instead of will, which she caught at immediately, and expressed great satisfaction at having the deed made.    *    *    *    Knowing that complications were almost certain to arise about the disposition of Miss Polly's property, I determined to surround myself and the deed with the same safeguards that had been resorted to about the will that I had written.    I excused myself to Miss Polly from writing the deed at that time, went up to see Mr. Downman and Dr. Ward, and made an appointment with them to meet at Miss Polly's house at a certain hour. Dr. Ward and I went at the appointed time.    At my request, Dr. Ward went into Miss Polly's chamber, and, in my presence, talked to her some time, and came out and told me her mind was as clear as he had known it in his life, and not to have the least hesitation about making the deed. I had told him my object in having him and Mr. Downman there on that occasion.    Presently Mr. Downman came in. I requested him to go into Miss Polly's room and inform him-

self as to Miss Polly's mental condition.    He has detailed in his deposition what took place then and there, which exactly corresponds with my recollection; and he has filed a memorandum made at the time, at my request, of what took place then and there.    *    *    *    I wrote the deed, read it over to Miss Polly in the presence of Mr. Downman, and she acknowledged she executed the deed through me, and acknowledged it before Mr. Downman to be her act and deed; and I think he carried it off to be recorded.   I signed the deed at her request, because she was lying on her back, and it was difficult to lift her up.   I thought her perfectly rational and sound of mind."

Being asked to state why he was so particular to preserve a memorandum of what took place, and request the same to be done by Mr. Downman, the notary who took the acknowledgment to the deed, Captain Payne said :

"Because I was morally certain there was. going to be a controversy over Miss Polly's property at her death by some of her kin-folks; in fact, I had notice served upon me to that effect, in this way :   In the early stages of Miss Polly's sickness, one day I met John Martin Porter, a nephew of hers, on the streets of Warrenton.   In the course of conversation that ensued between us, he informed me that he had heard that his Aunt Polly had made a will in favor of Mrs. Booth.   He said he was confident that that will would not stand; that he had heard that she was in a very bad way at the time it was made ; and, in fact, that she hadn't been in a position to make a will for many years; and that, if nobody else would, he would attack it himself."

In answer to a direct question, Captain Payne said :   " I saw a good deal of Miss Polly during her sickness, and I saw no evidence of an attempt to exercise undue influence over her, by Col. Porter, the Misses Kirkman, or any one else.   In fact, I heard Col. Porter repeatedly say to Miss Polly not to

bother herself about the disposition of her property at her death; that she was by no means rich—did not have more than enough to live on; and that, if she would take his ad- vice, she would spend it during her lifetime; and that he would see that she was always kept comfortable.  *  *  * I know that Miss Mary Ann Kirkman had the possession, control, and ownership of the house and lot on Culpeper street, which is the subject of this controversy, from the time of her (Miss Polly's) death until it was sold to Messrs. Rosenberger, Spindle & Co.   Miss Mary Ann Kirkman rented this property out, and collected the rents.  *  *  *  I dare say that the price was an adequate one, as the house was of little value."

"The note of Mr. Booth, about which my note filed here was, came into my hands for collection.   I saw Mr. Booth about it.   He made no objection whatever to paying it, on the ground of Miss Polly's mental condition; but he did not pay it immediately, and I sued him, and I collected the judgment through an execution.   I think the amount was over $200.00.   It went to judgment without defense, and I never heard of Mr. Booth making any objection to paying it on account of Miss Polly's mental condition."

Capt. A. D. Payne, R. H. Downman, and Dr. John Ward were present at the *factum* of the deed, and both Capt. Payne and Downman testified, unqualifiedly, as to the sanity of the grantor on that occasion.   Dr. Ward died before this suit was brought, and hence could not testify.   The testimony of Capt. A. D. Payne, R. H. Downman, and Mrs. Alice Payne, an aged lady, as venerable as *Mary, the mother of Washington*, all disinterested witnesses—two present at the making of the will, and two present at the making of the deed—shows that Mary Porter was perfectly sane and competent on both occasions.   Major John Scott says she was in full possession of her testamentary capacity on the 21st of June, 1882, when he was called in from the street, in passing, by Mrs. Agnes A. Booth, the appel-

lant, to write a will in her favor, which he did write, and for
which she offered to pay him.   Mrs. Ann P. Brown testified
that Mary Porter was perfectly sane during her observation
of her, up to the time of her death in June, 1886.   Col. Lewis
Porter, her brother, and one of her heirs at law, who declined
to be a beneficiary under her will, testified to her sanity.
Dr. Rixey, her physician from 1882 to 1886, testifies to her
sanity, and says: " She had every care and attention that a
sick person could have, and I never saw such devotion, and I
often told the Misses Kirkman that they would break them-
selves down from their constant attention, day and night."

Mr. Moses M. Green, a witness for appellants, testified to
her sanity; and Martha Butler, a colored witness for the
appellants, as to Mary Porter's insanity, says: " Yes, sir; it
seemed to come in spells; she wouldn't say everything right,
but *seemed to have sense enough.*"

Captain Payne, Mrs. Alice Payne, Colonel Lewis Porter,
and Miss Mary Ann Kirkman, all testify that no undue influ-
ence was exerted upon Mary Porter; and the burden of show-
ing the affirmative, which rests upon the appellants, is sup-
ported mainly, if not only, by the testimony of Mrs. Agnes
A. Booth, who called Major John Scott in from the street, *in
transitu,* on the 21st of June, 1882, to prepare a will for
Mary Porter, in which she was made the sole devisee; and
she offered to pay him for the work.

John Martin Porter, one of the appellants, who says that
the last time he ever saw Mary Porter was about three years
before she died, says: " She was regarded as crazy, or her
business would not have been taken out of her hands and put
into Mr. Keith's.   She has always been considered crazy by
everybody here in Warrenton, from what they said to me.   *I
don't know anything about it myself.*"   This statement has
reference to a charge in the bill (which is denied in the
answers that Mary Porter was, in March, 1851, treated as a

*lunatic,* by the appointment of a committee for her by the county court of Fauquier county.

This flimsy charge hath this extent—no more : On the 24th of March, 1851, some of Mary Porter's relatives, with an eye to the possession and management of her land and slaves and other property, and without any attempt to have her declared a lunatic, applied to the county court of Fauquier for the appointment of a committee for Mary Porter. This was ordered, and Arthur B. Nelson, a brother of Agnes A. Booth, and of the other female appellants, was appointed such committee. As soon as this performance became known to Mary Porter, and at the very next term of the said county court of Fauquier—to-wit, on the 28th day of April, 1851—the objectionable and unnecessary order of the court was rescinded ; and the said Mary Porter was restored to possession of her property and person. On the 26th of May, 1851, Mary Porter, reciting that ill-health and physical weakness prevented her from giving to the management of her business (400 acres of land and equipment for farming) that energy and close attention which she was in the habit of giving, conveyed her property, in trust, to the management of Mr. Isham Keith, a near neighbor and friend, who managed for her, and made a final settlement before a master commissioner on the 27th day of July, 1855, with the view (as stated in the report of the commissioner) to surrender the property of said Mary Porter, with her consent, back to her. This was done ; and Mary Porter has possessed and managed her property and business, without question or interruption, from August, 1855, to the day of her death, June 20th, 1886—a period of thirty-one years—without a word or act from any one challenging her sanity and business capacity. During which long period, the record shows, she lived in the town of Warrenton, bought and sold valuable properties, real and personal, and had business transactions with the most active and shrewdest business men in the community.

As to the error assigned that the court did not order an issue out of chancery to be tried by a jury, it is enough to say that no such motion or procedure was asked for or indicated by the appellants; and the learned judge was well prepared, by his familiar knowledge of the character of all the witnesses, as well as by the overwhelming preponderant weight of the testimony of numerous disinterested, high-toned, and unimpeachable witnesses, to dispose of the case without the intervention of a jury.

The record shows abundantly that Mary Porter was, at the time and in the act of making the deed of September 30th, 1882, to Mary Ann Kirkman, in full possession of her mental faculties, and was entirely capable of performing the same; that no undue influence was exerted by Mary Ann Kirkman, or any other person, to induce the said Mary Porter to execute the said deed; and that the property conveyed is not more than an adequate compensation for the board, medical bills, and other expenses, and unremitting personal care and attention rendered to Mary Porter by Mary Ann Kirkman. The circuit court of Fauquier so decreed, and the judgment of this court is to affirm the said decree.

DECREE AFFIRMED.