## 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢

### HUFF, EXECUTOR, AND OTHERS V. WELCH.

#### June 12, 1913.

1. WILLS—*Testamentary Capacity—Test.*—If, at the time of the execution of a will, a testator has sufficient mind and memory to intelligently understand the nature of the business in which he is engaged, to comprehend generally the nature and extent of the property constituting his estate and which he wishes to dispose of, and to know and to recall the objects of his bounty, and the manner in which he wishes to distribute his property among them, this is all the mental capacity needful to the execution of a valid will. If these requisities exist the will should be upheld although the testator was of great age and his mind enfeebled, his body debilitated and his memory not as good as formerly, especially where he has not abandoned his former and usual interest in his business affairs, and is capable of understanding and looking after them.

2. WILLS—*Testamentary Capacity—Opinions of Witnesses—Witness of Factum.*—Expressions of opinion by witnesses that the testator was not competent to make a will based upon facts which do not sustain the opinion are not to be considered as conflicting with the evidence of the witnesses of the factum who speak of the testator's condition immediately at the time of the execution of the paper in question, and who united in the unqualified statement that when the paper was executed by the testator his mind was clear and good, and that he fully comprehended what he was doing.

3. APPEAL AND ERROR—*Verdicts—Plainly Wrong—Wills.*—Where the mental capacity of a testator is involved on the trial of an issue *devisavit vel non*, the jury are the proper judges of the weight and credit to be given to the testimony of the witnesses, and their verdict, when sanctioned, as in the case at bar, by the trial court, is entitled to the highest respect in the appellate court, but when there has been a plain and palpable deviation from the proof, interference on the part of the appellate court is warranted.

Appeal from a decree of the Circuit Court of Rappahan-

nock county.    Decree for the complainants.    Defendants appeal.

*Reversed.*

The following instructions were given by the Court:

A. The jury are instructed that neither sickness, old age, nor impaired intellect nor all of them combined are sufficient, standing alone, to render invalid a will and even if the jury believe from the evidence that any one or more or all of these conditions existed in the case of the testator, Edward H. Huff, when he executed his will in question, and even though the jury shall believe from the evidence that the testator at the time of executing the said will was of advanced age or was infirm in health, and even though they may believe from the evidence that his intellect was impaired to some extent, nevertheless, if they shall further believe and find from the evidence that at the time of executing the said will, the said Edward H. Huff was capable of recollecting the property he was about to dispose of, the persons who were the objects of his bounty and the manner in which he wished his property distributed among them, and had an understanding of the nature of the business in which he was engaged, then the jury must find that he had legal capacity to make a valid disposition of his estate.

B. The court instructs the jury that although Edward H. Huff may have made oral declarations prior to the execution of his will to parties who were in no way interested in his property or affairs that he would leave his property to M. J. Welch or the children of M. J. Welch, or other parties than the parties named in said will, the said Edward H. Huff was in no way bound by such declarations and he had the right to change his mind at any time prior to the execution of said will, and if the jury believe from the evidence that the said Edward H. Huff at the time of the execution of the said will knew what property

he had and to whom he wished to leave it, they must sustain the will of the said Edward H. Huff.

C. The court instructs the jury that it is not necessary that a person should possess the highest qualities of mind in order to make a will, nor that he should have the same strength of mind which he formely may have had; the mind may be in some degree debilitated, the memory may be enfeebled, the understanding may be weak, and the testator may be wanting in capacity to transact many of the ordinary affairs of life, but it is sufficient if he possess mind enough to understand the nature of the business in which he is engaged in making his will has a recollection of the property he wishes to dispose of thereby, knows and recalls the object of his bounty, and the manner in which he wishes to distribute his property among them.

D. The court instructs the jury that every person over twenty-one years of age and of sound mind is entitled under the law to make a will and to dispose of his property as he pleases and to dispose against or among his next kin as he may choose, or if he choose he may even leave his property to strangers.

O. While the burden of proof is upon those offering a will for probate, to show testamentary capacity on the part of the testator at the time the will was executed to the satisfaction of the jury, yet the court tells the jury that there is in all cases an existing presumption in favor of the testator's sanity and capacity, which is to be taken into consideration by the jury in determining the question of competency.

P. The court instructs the jury that the testimony of credible witnesses present at the execution of the will is entitled to peculiar weight on the question of testamentary capacity and that this is especially true of attesting witnesses whose duty it is to ascertain and judge of the testator's mental capacity at the time.

H. The court instructs the jury that they cannot measure the testator's capacity nor inquire into the wisdom and prudence of his disposition of the property if the jury believe from the evidence that he is legally *compos mentis,* be he wise or unwise, he is the disposer of his own property and his will stands as a reason for his action. He is under no legal obligation to will his property to his relations, the justice or propriety of the will is not a question for the jury except that they may consider that matter as a circumstance bearing upon the testator's mental capacity. If he is a capable testator he can will his property as he chooses.

Q. The court instructs the jury that for the testator to be mentally capable of making a valid will, or to be of testamentary capacity, it is sufficient if at the time of executing said will the testator had an understanding of the nature of the business in which he was engaged, a recollection of the property he meant to dispose of, of the persons who were the objects of his bounty, and the manner in which his property was to be distributed among them. It is not necessary, however, that the testator should *actually* recall or recollect all of his property. It is sufficient if he was at the time of executing the will mentally capable of doing so; it is not necessary that he should have comprehended the provisions of his will in their legal form; it is sufficient if he fully comprehended it and understood at the time of execution of said will the actual disposition which he was thereby making or intended to make of his property.

The jury are further instructed if they shall believe from the evidence that at the time of executing said will the mind and memory of the testator was sufficiently sound to enable him to know and understand the extent and amount of his property and his relations to the objects of his bounty, and the business in which he was engaged, then he

was of sound mind and memory within the meaning of the law and they must find for said will.

R. The court instructs the jury that a testator must have testamentary capacity to make a will at the time at which such will is executed, and if the jury shall believe from the evidence that Edarwd H. Huff was mentally capable of making a will upon the date of its execution, the same is valid whatever may have been his condition mentally either prior or after the time of executing said will.

1. The court instructs the jury that the burden is upon the proponents of the will in this case to establish that the paper writing in question offered as the last will and testament of Edward H. Huff, deceased, is the true last will and testament of the said Edward H. Huff, and to do so they must establish to your satisfaction the following facts:

First, that the paper offered in evidence, and the whole paper, was thoroughly understood by the said Huff and intended by him to be his last will and testament;

Second, at the time of the writing and signing thereof the said Huff was of sound and disposing mind and memory;

Third, that the said paper writing was signed or acknowledged by the said Huff in the presence of John H. Updike and C. H. Keyser, the subscribing witnesses thereto both present, and in the presence of the said E. H. Huff at the same time, and that said subscribing witnesses subscribed the will in the presence of the testator Edward H. Huff.

2. The court further instructs the jury that one of the issues involved in this contest is whether the decedent, Edward H. Huff, possessed sufficient mental capacity to make a will on the 31st day of January, 1910, at the time the paper writing offered in evidence in this case was ex-

ecuted; and the jury are now told that the test of testamentary capacity is that the testator must have had sufficient mind and intelligence at the time the paper writing was executed to understand:

First, the nature of the business in which he was engaged;

Second, to recollect the property he was attempting to dispose of; to know and understand his relation to his blood kin or to others who might have claims upon him, and to determine the objects of his bounty, and the manner in which he wished to dispose of his estate with sense and judgment.

And if the jury believe that the decedent did not at the time the alleged will was executed possess mental capacity to know and understand these things, then they must find against the will.

3. The court further instructs the jury that in determining whether or not the paper writing in question is the true last will and testament of the decedent, Edward H. Huff, the jury has the right to consider the nature and character of the will, and if they find from the evidence that it is contrary to natural justice, they should take that fact into consideration along with the other facts and circumstances in the case, and the testimony of the witnesses in determining the question of capacity.

4. The jury are further instructed that testamentary incapacity does not necessarily require that a person shall actually be insane. Weakness of intellect, regardless of how it may arise, may render the testator incapable of making a valid will, provided such weakness really disqualifies him from knowing or appreciating the nature, effect and consequences of the act he is engaged in.

5. The court further instructs the jury that direct proof is not necessary to overthrow a will, but any facts and circumstances are sufficient as evidence that will satisfy

the jury of the incapacity of the testator to make testamentary disposition of his property at the time of the execution of his will.

*James F. Strother* and *Hiden & Thurlow,* for the appellants.

*Keith & Richards, Grimsley & Miller* and *H. G. Moffett,* for the appellee.

CARDWELL, J., delivered the opinion of the court.

The purpose of this suit is to contest the will of Edward H. Huff, deceased, which had been admitted to probate in the circuit court of Rappahannock county; the bill attacking the validity of the will being filed by M. J. Welch, a nephew of the testator. The grounds upon which it is claimed that the paper writing in question is not the last will and testament of the deceased are: (1) It was not executed and witnessed as required by law; (2) The said Edward H. Huff did not have testamentary capacity sufficient to execute said paper purporting to be his last will; and (3) Undue and improper influence exercised over the said Edward H. Huff by Lucy Phillips and some of her adult children, beneficiaries named in the paper writing purporting to be his last will.

There was an issue out of chancery to determine the questions raised by the pleadings, and the first trial thereof resulted in a mistrial and at the second trial the jury rendered a verdict finding that the paper writing in question was not the true last will and testament of the said Edward H. Huff, deceased, which verdict the trial court refused to set aside and entered its decree ratifying and confirming the finding of the jury, from which decree the plaintiffs in the issue obtained this appeal.

The objection of the appellee to the sufficiency of the record with respect to the certification by the trial court of the evidence, founded upon an error in copying the record, has been met by the certification of the clerk of an addendum to bill of exceptions No. 2, purporting to set forth the evidence, and, therefore, said objection will not be further considered.

It appears that Edward H. Huff died in Rappahannock county on the 10th day of February, 1910, after nine or ten days of illness, at the age of seventy-eight years, and that the paper writing in question was executed by him on the date therein stated, to-wit, the 31st day of January, 1910, and was afterwards duly probated as his last will and testament, whereby he bequeathed all of his personal property to his brother, W. J. Huff (spoken of in this record as John Huff), and devised his real estate, consisting of an undivided half interest in a tract of land known as the "Huff Place," to said John Huff for life, and then to the ten living children of Lucy Phillips and to the ten living children of Anna Robinson, deceased, each of the ten living children of Lucy Phillips (all of whom are named by the testator) "to take one eleventh of my said undivided interest in said real estate and the children of Anna Robinson, deceased, one eleventh part; I leave the said children of Lucy Phillips and the children of Anna Robinson, deceased, my interest in the said real estate after the death of my said brother, W. J. Huff, because they the said Lucy Phillips and her children have been faithful servants to me; Having heretofore deeded to my nephew, Mortimer Welch, my interest in the Holtzman place, it is my desire that he have no part of my estate."

The fact that the children of Lucy Phillips are John Huff's children is not questioned. Neither the said testator nor John Huff ever married, and their only sister, Columbianna Welch, died some years ago, leaving sur-

viving her a husband, Aldrich Welch, and a son, M. J. Welch, spoken of in this record as "Malt" Welch, and who is the contestant of said will in this ligitation. It further appears from the record that some time before the civil war Edward and John Huff and their sister, Columbianna Welch, inherited the "Huff Place," subject to an incumbrance securing a debt of about $1,800, and that they lived upon and held the said property in common for many years; that during the time Edward Huff, a skilled stone mason, followed his vocation, while John Huff was engaged in the huckstering trade about the country, their earnings going into the common or partnership fund; that Aldrich Welch and the boys of John Huff and Lucy Phillips ran the place, and the grown girls, also the children of John Huff and Lucy Phillips, together with the latter attended to the house work; that by these united efforts the debt of $1,800 on the "Huff Place" was paid off and later another piece of property, known as the "Holtzman Tract," was purchased, and that in 1892 Edward and John Huff had a division with Columbianna Welch whereby the "Holtzman Tract" was deeded to her as her share of the joint estate, and she and her husband moved over to the "Holtzman Tract," while Edward and John Huff never had a division between themselves, but continued to live upon the "Huff Place" and to hold it and all of their property as joint owners.

It further appears that Lucy Phillips and her children, or some of them, lived on the "Huff Place" with Edward and John Huff for at least fifty years, during which time neither Lucy Phillips nor any of her children ever received any compensation for their labor and service; that Lucy Phillips and her children always deported themselves kindly and attentively towards Edward and John Huff, nursing them in sickness and looking after their welfare and comfort when they grew old and feeble, Lucy Phillips and three of her children being with Edward continuously

during his last illness, while a fourth came from the State of Ohio to see him before his death. It further appears that all these children of John Huff and Lucy Phillips are of good character and were at all times attached—in fact devoted—to both Edward and John Huff and they to them, as evidenced in part by the fact that Edward and John Huff gave to each of the boys a horse and to each girl a cow when they left the "Huff Place," and gave dances and marriage parties for them, "Malt" Welch being also tendered and accepted a "home-bringing" at the "Huff Place" on the occasion of his marriage; and in these environments the said testator, Edward Huff, as seems to be conceded, lived his life out, satisfied with his surroundings, of which he, of course, had full knowledge, yet made no protest against them. On the other hand it appears, and equally as clearly, that between Edward and John Huff and "Malt" Welch and his family, in later years, there was but little intercourse, and that during the last illness of Edward Huff "Malt" Welch, who had not been at the "Huff Place" for several years, visited him but two or three times, rendering little or no service in looking after the welfare or comfort of the sick man, but this duty, so far as he was concerned, was left to devolve upon Lucy Phillips and her children, and was faithfully performed. While Edward Huff, according to "Malt" Welch's own statement, was, able to and did attend church regularly and to visit neighbors as late as November or December next before his death, he had not visited the home of "Malt" Welch for more than two years.

The will which is here attacked was written by Charles H. Keyser, a practicing and reputable lawyer of good standing, as seems not to be questioned, and he testified in this case that when he arrived at the home of the testator the latter told witness that he wanted him to draw his will; that the testator ate dinner with witness and

others at the table and went outdoors at least once that day; that no one was present during the drawing of the will except witness and the testator; that testator gave the necessary instructions, dictated the names of the beneficiaries, and detected an error in the will as first drawn; that the will was then redrawn and the error which the testator detected eliminated; that in the mean time Wade Massie and John Updike were sent for to witness the will, but after learning the disposition of the property Massie requested to be excused from becoming a witness to the will, because he thought it likely there would be a contest over it and he did not want to get mixed up in a law suit; that testator then signed the will in the presence of Keyser, the draughtsman of it, and John Updike, who subscribed the same as witnesses; that testator was then sitting in an invalid's chair, reclining slightly, and again when referring to the disposition he had made of his property stated that that was the way he wanted it to go, and that if he had paid Lucy Phillips' children for the work they had done it would amount to much more than he was giving them in his will.

Keyser, Updike and Massie, the witnesses of the factum, all testified, being the only witnesses in the case who could speak of the testator's condition immediately at the time of the execution of the paper in question, and they unite in stating, without qualification, that when the will was executed the testator's mind was clear and good; that he fully understood the transaction and all about what he was doing; Massie stating not only that the testator was fully capable of making his will, but he told witness then and there "that that was his will; that that was the way he wanted his property to go," and urged him (Massie) to witness the will, and Massie's only reason for not doing so was that "he feared there would be contest by the Welches" and he "did not want to be bothered with having to testify in a suit."

Will Rowles, another white neighbor of the testator, and also of high standing, who talked with the testator shortly after dark on the day his will was written and executed, testifies that the testator was fully capable of making a will on that day if he had thought it over before, and stated certain facts gathered from the testator as to the reasons which had prompted him in preferring to dispose of the property as he had done; and that he recognized witness and "talked intelligently."

The trial court gave to the jury an instruction, not objected to, that there was no evidence in the case to support the issue of undue influence, and in reaching their conclusion they should eliminate that question, and the charge that the paper writing in question was not executed and witnessed as required by law has been practically abandoned in this court; so that the real issue presented is, whether or not the evidence warranted the finding of the jury with respect to testamentary capacity of the testator.

The testimony offered to sustain the charge of mental incapacity is that of a number of witnesses who claimed to have known the testator well and who express the opinion that he was not competent to make a will, which evidence when analyzed discloses that the opinions of the witnesses are based only on the circumstances that the testator was old (78 years of age), rather feeble, and his memory not as good as formerly, as evidenced by his being at times unable to recall the names of persons whom he had known for years, or the name of a place or places with which he had been familiar, or on eccentric acts or expressions gathered at different times from testator's whole life. None of the witnesses say that the testator had abandoned his former and usual interest in his business affairs, or was incapable of understanding and looking after them, or did not have knowledge of his property or was incapable of selecting the subjects of his bounty when he came to de-

termine to whom he would prefer to will his property; in
fact, the unconflicting testimony in the case is that the
testator attended to his ordinary business affairs up to the
time of the execution of his will and later, and was at the
time his will was executed of sufficient intelligence to un-
derstand the nature of the business in which he was en-
gaged, to recollect the property that he wished to dispose
of, to know and recall the objects of his bounty, and the
manner in which he wished to distribute his property
among them.

The plaintiffs in the issue (appellants here) asked for
ten instructions to the jury, all of which were refused, and
in lieu thereof the court gave fourteen instructions, desig-
nated respectively as A, B, C, D, O, P, H, Q, R, 1, 2, 3, 4
and 5, to which refusal to give appellants' instructions
and the giving of the instructions of the court marked 1, 2,
3, 4, 5, O, H and P the appellants excepted.

The instructions given by the court, all of which appear
in the statement preceding this opinion, were ample to
submit to the jury fully and fairly the case which the evi-
dence adduced tended to prove, and we are, therefore, of
opinion that the court committed no reversible error in
its rulings with respect to the instructions refused or to
those given.

"The law requires, in determining mental capacity, not
so much of any particular character or intellect as the
ability to make certain efforts of the mind and memory.
The rule of testamentary capacity is that the testator must
have sufficient mind and memory to intelligently under-
stand the nature of the business in which he is engaged,
to comprehend generally the nature and extent of the prop-
erty which constitutes his estate, and which he intends to
dispose of, and to recollect the objects of his bounty. If
he possesses these attributes he has testamentary capacity.
The testator need not have the same perfect and complete

understanding and appreciation of these matters, in all their bearings, as a person in sound and vigorous health of mind and body would have; nor is he required to know the precise legal effect of every provision made in his will. Absent-mindedness or mere intellectual feebleness does not disqualify a person to make a will, as the feeble have as much right to dispose of their property as the strong, but something short of insanity is sufficient to invalidate it. One capable of transacting ordinary business is presumed capable of making a will although not of sound mind." 40 Cyc. 1004, and authorities cited.

At page 1108 the same authority says: "If the testamentary requisites are found the will may be valid, although executed by one of great age whose mind is enfeebled, whose body is debilitated, whose memory is failing, and whose judgment is vacillating, especially where the will is fairly made and apparently emanating from a free will, or where testator was a good business man; but not where an aged person is so enfeebled mentally as not to understand what he is doing, as when he is suffering from hallucinations or paralysis or softening of the brain."

"The law prescribes no limit in point of age beyond which a person cannot dispose of his property. A man eighty-nine years of age is often as capable of making a deed or will as at any other period of his life. The greatness of his age is not proof of mental incapacity." *Howard* v. *Howard,* 112 Va. 566, 72 S. E. 133.

The authorities have not undertaken to prescribe any particular degree of mental acumen as the measure of one's capacity to execute deeds or wills, but all agree that the test is whether the party had at the time of the execution of the instrument sufficient capacity to understand the nature of the transaction he was entering into, and to assent to its provisions. *Wampler* v. *Harrell,* 112 Va. 635, 72 S. E. 135.

In *Jarrett* v. *Jarrett,* 11 W. Va. 584, the court, in discussing whether or not a grantor in a deed had mental capacity at the time of its execution, said, with respect to the weight to be given evidence upon the question of mental capacity, that the evidence of witnesses present at the execution of the deed is entitled to peculiar weight, and that the mere opinions of witnesses not experts are entitled to little or no regard, unless they are supported by good reasons founded on facts which warrant them; and if the reasons and facts upon which they are founded are frivolous the opinions of such witnesses are worth but little or nothing.

In the recent case decided by this court, *Woody et al* v. *Taylor et al,* 114 Va. 737, 77 S. E. 498, the opinion by Harrison J., in disposing of strikingly similar testimony to that offered in this case to sustain the charge of mental incapacity of the testator to make a will, says: "They (the witnesses) express the opinion that he was not competent to make a will, but, as was said in *Beverly* v. *Walden,* 20 Gratt. (61 Va.) 147, this is their opinion, but when we come to analyze their evidence we find that their opinions are not justified by the facts upon which they are based."

In *Beverly* v. *Walden,* 20 Gratt. (61 Va.) 147, the opinion by Christian, J., says: "In such case the testimony of witnesses present at the *factum,* and the written acts of the party attesting his capacity, are more to be relied on than the mere opinions of other witnesses, based upon facts which may be true yet not the result of unsoundness of mind." *Porter* v. *Porter,* 89 Va. 118, 15 S. E. 500.

Expressions of opinions by witnesses that the testator was not competent to make a will based upon facts which do not sustain the opinions are not to be considered as conflicting with the evidence of the witnesses of the factum who speak of the testator's condition immediately at the time of the execution of the paper in question and unite in the un-

qualified statement to the effect that when the paper was executed by the testator his mind was clear and good, and that he knew all about what he was doing. *Woody* v. *Taylor, supra.*

It is very true that in such cases as this the proper judges of the weight and credit due to the testimony of the witnesses are the jury, and their verdict, when sanctioned, as in this case, by the trial court, is entitled to the highest respect in the appellate court, but when there has been a plain and palpable deviation from the proof, interference on the part of the appellate court is warranted. *Young* v. *Barner,* 27 Gratt. (68 Va.) 96.

We have here the clear and positive testimony of not only the two attesting witnesses of the will, but that of Wade Massie and of Will Rowles, two reliable neighbors, as well as that of Hugh Phillips who lived with the testator up to the time of his death, as to the capacity of the testator to make a will, none of which testimony conflicts with any evidence introduced by the contestant of the will; moreover, there is other unconflicting evidence adduced by appellants, the proponents of the will, plainly showing a memory consistent with the testator's age, and a capacity to understand his business affairs and to direct their management, not only up to the date of his will, but after, and practically to the last of his life.

We are of opinion that the verdict of the jury complained of is a plain and palpable deviation from the proof in the case, and, therefore, the decree of the circuit court appealed from has to be reversed, the verdict of the jury set aside, and the cause remanded for further proceedings therein not in conflict with the views expressed in this opinion.

*Reversed.*