## Staunton

ATLANTIC LIFE INSURANCE COMPANY, A CORPORATION V.
MABEL A. FUGATE AND ATLANTIC LIFE INSURANCE
COMPANY, A CORPORATION V. MABEL A.
FUGATE, ADMINISTRATRIX OF THE
ESTATE OF HENRY C. FUGATE,
DECEASED.

September 21, 1933.

Present, Campbell, C. J., and Holt, Epes, Hudgins and
Gregory, JJ.

The opinion states the case.

*William A. Stuart* and *A. B. Scott,* for the plaintiff in error.

*Warren & Cantwell* and *Henry Roberts,* for the defendant in error.

HUDGINS, J., delivered the opinion of the court.

Mabel A. Fugate, in her own right and as administratrix of Henry C. Fugate, recovered two judgments in the sum of $5,000 and $2,300 respectively, against Atlantic Life Insurance Company, on an insurance policy issued by defendant company on the life of Henry C. Fugate. The $2,300 was the amount claimed for "total disability benefits," at $50 per month, during the life of the insured.

The defendant below assigns nine errors to the ruling of the trial court, but in our view of the case it is necessary to consider only one, *i. e.,* the refusal of the court

to set aside the verdict on the ground that it was not supported by the evidence.

On June 29, 1921, defendant company issued its policy for $5,000 on the life of Henry C. Fugate, of Bristol, Virginia, naming Mabel A. Fugate, wife of the insured, beneficiary. The policy contains a supplemental contract, designated "Total Disability Benefit," the material parts of which are:

"Atlantic Life Insurance Company hereby agrees that if, * * * while this contract is in full force by the payment of premiums, the insured shall furnish proof satisfactory to the company that * * * he has become totally and permanently disabled, and will by such disablement be prevented for life from engaging in any gainful occupation, the company shall, by endorsement hereon, agree to

"(1) Continue the contract without requiring the payment of premiums, if any, thereafter falling due during the continuance of such disability, * * * and in addition thereto,

"(2) Pay immediately to the insured * * * 1/100th of the face value of said contract ($10 for each $1000) and a like sum on the same day of each month thereafter during the life of the insured and the continuance of the disability."

The premiums on this policy due June 29, 1921, '22 and '23 were duly paid. There was default in payment of the premium due in 1924 and only $18.80 was paid on that due in 1925. Under the automatic loan provisions of the contract, the policy was continued in force until June 29, 1927. On that date the unused loan value of the policy ($77.50) was not sufficient to pay the annual premium then due and was applied to purchase of extended term insurance, which expired January 10, 1929. The insured died February 2, 1931, without having made claim to any benefits under the contract. A year later, February, 1932, these actions were instituted.

Defendant contends that the failure to give notice or

furnish proof of the disability·of the insured prior to June 29, 1927, is sufficient, alone, to bar recovery on the policy. This question was decided and the conflicting authorities reviewed at length by this court in an opinion delivered by Judge Gregory in *Swann* v. *Atlantic Life Ins. Co.*, 156 Va. 852, 159 S. E. 192, 195, where it is said:

"We conclude that the giving of notice and proof of disability was not a condition precedent to the right to a waiver of premiums where the insured through no fault of his own has become, while the policy is in force, mentally and physically incapable of giving the notice or furnishing the proofs to the company, * * *."

In that case the question arose on the pleadings. It was remanded for trial on the merits. It was again before this court and reported in *Atlantic Life Ins. Co.* v. *Swann*, 160 Va. 125, 168 S. E. 423, 425. Chief Justice Campbell, who wrote the opinion, discussing an instruction which told the jury that the plaintiff "must show, by the preponderance of the evidence, that the insured was, during the entire time between the onset of his disability, if any, and his death, *reasonably incapable* of notifying the company of his disability or of furnishing the company proof of such disability," said:

"The insertion of the word 'reasonably' in the instruction renders it erroneous. To be relieved of the necessity of giving notice or furnishing proof, the insured must be totally (either physically or mentally) incapacitated from acting in the matter."

In that case it was conceded that before the lapse of the policy the insured had become totally and permanently disabled, whereby he was prevented for life from engaging in any gainful occupation, but it was denied that he was physically or mentally incapable of giving notice or furnishing proof from the date of his disability to the time of his death. The court reversed the case on two grounds; (1) that the instruction referred to above was erroneous, and (2) that the evidence tending to show

physical and mental incapacity did not support the verdict.

In the case at bar, the defendant not only contends that the insured was physically and mentally capable of giving notice and furnishing proof, but that at no time prior to the lapse of the policy had he become so totally and permanently disabled, within the terms of the contract, that he was prevented from engaging in any gainful occupation.

In the view that we take of the case, it is unnecessary to decide whether or not the insured, during the life of the policy, suffered a total and permanent disability within its meaning, for he may have been totally and permanently disabled, and yet have been both physically and metally capable of giving notice or furnishing proof to the company of his condition. Inasmuch as the plaintiff is here with verdicts approved by the trial court, we will edeavor to summarize the evidence as strongly in her favor as the record fairly permits.

It appears that Henry C. Fugate moved from Russell county to Bristol, Virginia, in 1916; that prior to 1924 he was comparatively healthy and fairly successful in business; that in 1924 or '25 he suffered financial reverses and lost most of his property; that about the same time he became ill and was confined to his bed from November, 1924, to April, 1925. His family physician, then or later, advised his wife, but did not inform him, that he had pellagra. In 1926 and '27 he was confined to his bed a part of the time, and in the latter year was critically ill for several months. The two physicians who had formerly attended him died. In 1930 he consulted Dr. Rogers, in whose office he was given medical attention once in September, four times in October, four times in November, and twice in December. After December 27th of that year, the doctor visited him at his home until his death on February 2, 1931. At intervals during these five years, the insured engaged in supervising the building of houses for sale.

In the examination of both the wife and daughter are found answers to certain questions which, if considered separate and apart from their entire testimony, support the contention that the insured had lost both his physical and mental powers; but when this testimony is considered as a whole, it is apparent that the insured at various times between 1924, or late in 1926, when it is claimed he became totally and permanently disabled, and the date of his death, was engaged in various business transactions. The testimony of both of these witnesses reveals that the insured maintained an office as late as the year 1930, and when he was unable to go to his office conducted his business from his home, sometimes from his sick bed; that his daughter was frequently kept from school to attend to business matters under his direction. While both his wife and daughter admitted these facts, neither went into details about them. The extent of the insured's various business activities during this time is shown by the witnesses for defendant, and may be stated thus:

For a year prior to January, 1926, the insured worked in the real estate office of Frank E. Miller. At times, because of his despondency, he was more of a hindrance than a help in making sales of real estate, but these attacks were temporary, and some sales were made by him and commissions received therefor.

In January or February of 1926 he accepted employ ment in the real estate office of Frank White. Just how long he remained in this position and the amount of commissions, if any, he received, is not shown by the evidence.

Early in 1927 Fugate formed an equal partnership with E. H. Parks for the purpose of building and selling houses in the city of Bristol. The partners, together, selected plans for the houses to be built. They seem to have contemplated that Fugate should devote his entire time to supervision of the building, as Parks was employed elsewhere. When the first house was begun, Fugate was in

full charge of the work. He kept the time of the workmen and saw that building materials were duly delivered. This required his presence frequently, if not daily, on the building site. He usually drove his own car, but he was weak physically and frequently kept his daughter from school in order to drive him about the city and otherwise assist him in the performance of his duties. Before the completion of this building in the late spring or early summer of 1927, he was taken sick and was unable to perform the duties outlined above. Parks gave up his outside work and assumed full charge of the partnership duties. In the fall of 1927 Fugate recovered, or partially recovered, from his illness and resumed his work for the partnership in the erection of two other houses, which were completed by May, 1928. They were unable to sell the houses at a satisfactory price, so Parks purchased for $650 the interest of Fugate in two of them, and the partnership was dissolved.

C. C. Brown testified that in April, or May, 1928, he made a contract with Fugate wherein Fugate promised and agreed to erect a building on a lot owned by him for approximately $6,500; that during the erection of this building he saw Fugate on an average of three or four times a week, and that he was on the building site personally superintending the work; that he completed the work in accordance with the terms of the contract. In September, 1928, they made a second contract wherein Fugate promised and agreed to erect another house for him for about $5,000; that he frequently saw Fugate during the erection of this house looking after the work, and that he completed it according to the terms of the contract. He further testified that while during this time Fugate frequently complained of not feeling well, the work was completed under his supervision. Just when this last building was completed and final settlement made the evidence does not show, but other testimony shows that it usually takes from two to four months to complete a building of this type, which would indicate

that final settlement was not made before December, 1928, or the following January.

Sometime in the spring of 1929, Fugate formed a partnership with Collier, who was connected by marriage with one of the officers of Virginia Woodworking Company, and by October, 1929, the partners, working together and financed by Virginia Woodworking Company, had erected three houses. During the erection of these houses, Fugate continued to look after the building, to keep the time of the laborers, receive money from Virginia Woodworking Company, and pay it to the men engaged in the work. The partnership was operated in the name of H. C. Fugate and Company, and it was generally known that Collier was the company. The lots were purchased with money furnished by Collier or Virginia Woodworking Company. When the houses were completed H. C. Fugate and wife executed mortgages covering the amount furnished by the parties who had financed the building, and when the properties were sold the purchasers assumed payment of the mortgages.

Plaintiff contends that Fugate was a straw man used by the parties financing the buildings for the purpose of evading any loss which might occur from these operations. There is, however, not sufficient evidence to justify any such conclusion. The partnership of Fugate and Collier continued until February, 1930, when Collier moved away from Bristol. The deeds by which the property was bought, sold and mortgaged, executed by H. C. Fugate and wife, either separately or jointly with others, are seventeen in number and are filed as exhibits in the record. The first of these deeds is dated October 27, 1927, and the last July 14, 1930. Two of these instruments were executed in 1928; twelve were executed, delivered and recorded after January 10, 1929, on which date all rights of the insured, or his beneficiaries, ceased under the contract of insurance.

The wife admitted that she executed these instruments with her husband, but claimed that she did it to keep

peace in the family and to keep her husband from being irritated; that if he was crossed by members of the family he became irritable and morose and at times had threatened to kill himself. If at that time the wife thought that her husband did not have sufficient mentality to execute these various instruments whereby the rights of other parties were seriously affected, it seems strange that she did not communicate this fact to the parties interested.

As late as November, 1929, Fugate was examined by Dr. B. Snapp, of Bristol, in connection with an application for insurance, and in this examination, on being asked to state all causes for which he had consulted a physician in the last ten years, answered, "Pernicious anemia, one attack, 1927 and 1928, duration four months, and no remaining effect," and further stated that he was then in good health. Dr. Snapp stated that he did not recommend him as a first class risk, due to his past history, but that he saw nothing wrong with his mental condition at that time. The doctors called in behalf of plaintiff testified, in effect, that while Fugate, during the time in question, was a sick man and did not have his normal mental ability, he knew and understood what he was doing.

When all the evidence is considered together, as it must be, there is little, if any, material conflict. It is established that Fugate never fully regained his health after the illness which began in November, 1924, and that at more or less frequent intervals thereafter he was confined to his bed; that his earning ability was greatly decreased, but that he had sufficient mental powers to realize the duty he owed his family, and sufficient will power to endeavor to perform that duty, notwithstanding his weakened condition; that at intervals his mind was more or less affected by worry over his financial and physical condition. The burden was on the plaintiff to establish by a preponderance of the evidence that before the lapse of the policy he became totally and per-

manently disabled and was by such disablement prevented for life from engaging in any gainful occupation, and that from the onset of this disability until the time of his death he was physically and mentally incapable of giving notice or furnishing proof satisfactory to the company. This burden plaintiff has failed to bear.

Plaintff recognizes that this is the vital question involved in the case, and contends that there is sufficient evidence to take the case to the jury, and cites a number of cases in which this court has stated the rule by which we are guided in disposing of like questions. The juries are the proper judges of the weight and credit to be given the testimony of witnesses where there is a substantial conflict in evidence; when, however, there is no material conflict and there is a plain and palpable deviation from the truth, it is the duty of the court to intervene. *Huff* v. *Welch,* 115 Va. 74, 78 S. E. 573, 574.

The evidence conclusively establishes that both before and after June 29, 1927, the insured was engaged in numerous business activities. This completely negatives the contention that while the policy was in force, he was either physically or mentally incapable of giving notice or furnishing proof to defendant of his condition.

For the reasons stated, the judgments of the trial court are reversed, the verdict of the jury set aside, and final judgments here entered for defendant.

*Reversed.*