## Richmond.

88 753
90 542

### CROPP v. CROPP.

February 11th, 1892.

1. DEEDS — *Cancellation—Insanity—Case at bar.*—Shortly after his liberation from lunatic asylum "as restored," grantor, a childless man, granted his entire property to his wife, to whom he attributed his success, and was much attached. This he did according to his previously declared intentions and repeated subsequent references. Ten years afterwards he committed suicide. The evidence as to his mental condition conflicted; but there was no evidence of any incompetency at the time he executed the deed. Eccentricities were proved; but many of the witnesses thought him sane and capable;

HELD:

    That, as the evidence does not show any continuous and chronic insanity, but only a temporary derangement, from which the records of the asylum show he had recovered, the burden of proof is on the party attacking the deed, to prove insanity at the time the deed was executed, and that has not been done.

2. Evidence of non-professional witnesses admissible in such cases.

Appeal from a decree of the circuit court of Fauquier county, rendered February 1, 1890, in a suit in equity, wherein W. W. Cropp was plaintiff, and Ann M. Cropp and others were defendants. The object of the suit was to set aside a certain deed of gift made by J. Thornton Cropp on the 13th of January, 1877, whereby he conveyed to a trustee for the benefit of his wife, the said Ann M. Cropp, all his estate, consisting of a tract of land containing 160 acres, and personalty of the value of several thousand dollars. The deed was not recorded until after the grantor's death, which occurred by his own hand on the 31st of March, 1886.

The complainant was the brother and sole heir-at-law of the deceased; and the principal ground upon which the deed was sought to be set aside was insanity on the part of the grantor.

The circuit court dismissed the bill, whereupon the complainant obtained an appeal to this court. Other facts are stated in the opinion.

*Wm. Patrick* and *Meredith. & Cocke*, for appellant.

*Wm. H. Payne* and *W. W. & B. T. Crump*, for appellee.

LEWIS, P., delivered the opinion of the court.

The principal, if not the only real question in the case, is whether at the time the deed of the 13th of January, 1877, was executed, the grantor, J. Thornton Cropp, was sane and mentally competent to make the deed. The bill alleges that the deed is void on three grounds—viz., (1) Because it was not duly acknowledged; that is, because Goode, by whom the acknowledgment was taken, had ceased to be a justice of the peace; (2) because the deed was never delivered; and (3) because the grantor at the time was insane.

The first point of objection is an altogether immaterial one, inasmuch as acknowledgment was not essential to the validity of the deed, nor as between the parties to the present suit—namely, the beneficiary in the deed (the wife) and the heir-at-law, was recordation of the deed essential. And as to the second point, it is enough to say that the answer, which is responsive to the bill which calls for an answer on oath, alleges that the deed was duly delivered; and it is conceded that this responsive averment must be taken as true; if the evidence shows sanity on the part of the grantor when the delivery was made; so that the case virtually turns upon the question of the grantor's sanity in January, 1877. *Morrison* v. *Grubb*, 23 Gratt. 342.

The bill states, and the evidence shows, that for several months during the year 1876 the grantor was an inmate of the Western Lunatic Asylum at Staunton; that on the 20th of December of that year he was discharged, and that the deed was executed within one month thereafter; that the deed conveys all the grantor's property, real and personal, in consideration of natural love and affection, and that the property, or the most of it, continued in his ostensible possession until his death in March, 1886, when he committed suicide.

The answer denies the charge of insanity, and avers that from the time of the grantor's discharge from the asylum until a very short time before his death his mind was sound, and that during the whole of that time he closely and successfully attended to his own affairs. It avers further, that the deed was prepared by Charles T. Green, Esq., an eminent member of the Warrenton bar, and that it carries out the often-declared purpose of the grantor's mind; that some time after the acknowledgment of the deed he (the grantor) hearing a rumor that Goode was not a justice of the peace (on account of his removal from one magisterial district in the county to another), out of abundant caution re-wrote the deed with his own hand, and after acknowledging it before a notary, on the 15th of May, 1887, delivered it to the respondent, who exhibits it with the answer. And referring to the allegation in the bill that the most of what the grantor possessed at the time of the execution of the deed had been wrongfully obtained by him from his father's estate, at the expense of his co-heirs, the answer avers:

" Respondent has no apprehension that the well-settled purpose of her husband, as set out in the deed, will be set aside to gratify the rapacity of a brother, who never showed a brother's love whilst the deceased was living, and who now slanders him in his grave. She denies the legal propositions asserted by the complainant, and will prove by her neighbors that the deeds express the intelligent purpose of her husband; that they are

just and proper deeds, and delivered to her, and designed for
her comfort in her old age, and to prevent, probably, the
unfeeling brother from getting his estate."

Much evidence was taken, and when the cause came on to
be heard the bill was dismissed by the decree complained of.

The complainant took the depositions of a number of
witnesses who lived in the neighborhood of the deceased,
and also that of Dr. Edward C. Fisher, who, during the
year 1876, was an assistant physician at the lunatic asylum
at Staunton.

The latter witness, while admitting that the records of the
asylum show that the deceased was discharged on the 20th of
December, 1876, as *recovered*, yet gives it as his own opinion
that he was not a cured man. Ill-health, he says, was the sup-
posed cause of his insanity, which was melancholia. It does
not appear, however, that the witness objected to the patient's
discharge from the asylum, or that if he disagreed in opinion
with his superior officer as to the patient's mental condition,
he in any way made the fact known. He says he regarded
him as "improved and convalescent," at the time of his dis-
charge, and when asked to state whether he then regarded him
as competent to contract, he rather vaguely answered that he
did not consider him capable " of entering into the matters of
the world with success." It is obvious, moreover, that the
witness' opinion was not a little influenced by an unsupported
statement made to him by the complainant, who accompanied
his brother to the asylum, that the insanity of the latter was
largely due to " self-reproach for having appropriated to him-
self the larger portion of their deceased father's estate,"
which supposed fact, no doubt, prompted the witness to testify,
as he did, that while the deceased may have been " capable of
appreciating the value of his property," he considered him
susceptible of impulses, caused by extraneous matters or other
circumstances, which would soon disclose a morbid state of
feeling on his part.

We see nothing, therefore, to justify the conclusion that when the deceased was discharged from the asylum, less than a month before the deed was made, he was not a " recovered " man.

Was he, then, insane when the deed was made? To show that he was, the complainant also examined, a number of non-professional witnesses. None of these witnesses, however, were present when the deed was executed, and we are constrained to say, so limited and imperfect were their opportunities of forming an opinion as to the mental condition of the deceased, after his return from the asylum, that but little weight is due to what they say on that subject. Some eccentricities on his part, it is true, were proven; but when closely examined the evidence falls far short of proving actual insanity Several of the witnesses are proven to have been prejudiced against the deceased, and the opinions of none of them are founded upon anything more than casual observation, and not very much of that, covering a period of nine years and upwards; that is, from December, 1876, to March, 1886. Moreover, one of the plaintiff's witnesses, who was a merchant in the neighborhood, nowhere in his deposition states that he at any time considered the deceased insane, but does say that after his return from Staunton he dealt largely at his store, and that he (the witness) often visited him at his house. His credit, he says, was first-class; that he could have gotten credit at the store for any amount, and that he was *a judicious and prudent buyer.*

For the defendant a number of witnesses—mostly business men and neighbors—were examined, whose opportunities for forming an intelligent opinion on the subject in question were frequent. One of them testifies that he did business for the deceased—selling his cattle for him—for a number of years, and that he considered him as competent to transact business as anyone he knew. The same witness also represents him as an extremely industrious man in attending to his business. He often conversed with him, about his farming opera-

tions, and says he repeatedly mentioned to him in these conversations that he had given all his property to his wife, whom he spoke of as one of the best women in the world, without whose assistance he could never have paid for the farm.

Another witness testifies to having borrowed money from him in 1878.. He says he (witness) drew the note for the sum borrowed ($500.00), and made it payable on demand, seeing which, the deceased objected to the form, telling him to make the note payable twelve months after date. " If I were to die," he said, " you might be called on for the money immediately; but if the note is made payable twelve months after date they can't call on you for it until that time runs out." The note was then drawn as suggested, and the witness paid the interest on it annually, which the deceased himself invariably credited on the back of the note. The same witness also gives other instances of his prudence and carefulness in attending to business, and says he considered him perfectly rational until only a few days before his death.

Other witnesses, who had frequent business transactions with him during the last few years of his life, testify with equal positiveness that in their opinion he was sane.

Nor is there anything in the nature of the transaction itself which gives rise to any presumption against it. At the time the deed was executed, the deceased was well advanced in years, as was his wife, and they were childless. He was, moreover, deeply attached to his wife, who had been faithful to him, and who had materially assisted him in accumulating what property he had. What more natural, then, than that he should have preferred her to have the property rather than the complainant, between whom and himself the record, to say the least, discloses no trace of brotherly affection whatever?

In short, we are of opinion that inasmuch as the evidence does not show an habitual insanity on the part of the deceased— *i. e.*, an insanity continuous and chronic in its nature—but a temporary insanity only, from which the records of the asylum

show he had recovered, the burden to prove incompetency when the deed was executed was on the complainant, and that this has not been done.

We make no reference to the authorities on insanity which were cited in the argument, because upon the non-professional evidence it is clear that the circuit court rightly upheld the deed, and dismissed the bill. That such evidence is admissible in a case like the present is not an open question in this court. Nor does its value depend upon the number of the witnesses, but upon their intelligence, means of knowledge, and the reasons they give for their opinions. Hence, where such witnesses are conversant with the life of the person in question, his disposition and habits, and have long been on terms of familar intercourse with him, their testimony is justly regarded as being entitled to greater weight than that of scientific witnesses who have not had such opportunities of forming an opinion. *Clark* v. *Fisher*, 1 Paige, 171; *Hardy* v. *Merrill*, 56 N. H. 227; *Beaubien* v. *Cicotte*, 12 Mich. 459; *Ins. Co.* v. *Rodel*, 95 U. S. 232; *Conn. Mut. Life Ins. Co.* v. *Lathrop*, 111 *Id.* 612; *Fishburne* v. *Ferguson*, 84 Va. 87.


DECREE AFFIRMED.