# Richmond.

## FOREHAND V. SAWYER, ETC.

### January 20, 1927.

1. TESTAMENTARY CAPACITY—*Evidence—Lay Witnesses.*—Lay witnesses who have observed the testator in his lifetime may state facts which came under their observation, and may give their opinions based upon the data observed as to the mental capacity of the testator. But frequently, as in the instant case, the data observed do not warrant the opinions expressed, and where that is the case the opinions are of little, if any, value on the question of mental capacity.

2. TESTAMENTARY CAPACITY—*Witnesses—Those Present at the Execution of the Will.*—The testimony of those present at the execution of the will is entitled to the greatest consideration. The time at which a will is executed is the vital time for mental capacity to exist. If it appears that the testator had mental capacity at that time, it is immaterial what his mental condition was before or after that time. Testimony on the subject of prior or subsequent incapacity is only relevant as tending to show incapacity at the time of execution. It is for this reason that so much importance is attached to the testimony of those who were present at the *factum.*

3. TESTAMENTARY CAPACITY—*Witnesses—Subscribing Witnesses.*—Usually great consideration is attached to the testimony of the subscribing witnesses called by the testator, or with his assent, to witness the will, but if they had no previous acquaintance with the testator, were not selected by him and nothing was said or done by him at the time to indicate his then mental condition, it is said that their testimony is not accorded the weight which would otherwise attach to it. .

4. TESTAMENTARY CAPACITY—*Witnesses—Attorney Who Drew the Will.*— The testimony of a reputable attorney who receives the instructions for drafting the will, drafts it, reads it over and explains it to the . testator, and is present at its execution, is entitled to very great consideration as to the mental capacity of the testator. This is especially true in the absence of any suggestion of fraud, lack of memory or uncertainty as to what transpired, and when not in conflict with the testimony of the subscribing witnesses.

5. TESTAMENTARY CAPACITY—*Family Physician.*—Great weight is always attached to the testimony of the family physician on the question of capacity to make a will.

6. TESTAMENTARY CAPACITY—*Witnesses—Subscribing Witness to Former Wills.*—The testimony of subscribing witnesses to former wills impeaching the mental capacity of the testator at the time they subscribed is entitled to little weight. Such testimony is always viewed with suspicion.

7. WILLS—*Testamentary Capacity—Evidence—Case at Bar.*—In the instant case testator devised his real property to another woman than his wife with a provision that she should pay his wife $200.00 a year. Testator's wife and brother contested the will for want of testamentary capacity. Testator attended to his business up to the time of his death; no committee was ever appointed to take charge of his estate. There was no evidence that testator's sanity was ever a subject of comment or discussion by the witnesses for contestants until after his death. The evidence of these witnesses was unsatisfactory and of little weight, they knew little but imagined much, thinking the will an unnatural one. The evidence of the reputable attorney who drew the will and the attesting witnesses were strongly in favor of testator's capacity to make a will. The family physician of testator also testified that he was capable of making the will. Another physician who saw him shortly before his death about five months after the execution of the will testified that at that time he was incapable.

*Held:* That lack of testamentary capacity had not been shown.

Appeal from a decree of the Circuit Court of Norfolk county. Decree for complainants. Defendant appeals.

*Reversed and remanded.*

The opinion states the case.

*George C. Cabell,* for the plaintiff in error.

*Q. C. Davis* and *I. W. Eason,* for the defendants in error.

BURKS, J., delivered the opinion of the court.

Wiley Sawyer was sixty-one years old, his wife seventy-six. He owned a small tract of thirty-three acres of land in Norfolk county, upon which there was a

dwelling house assessed for taxes at $1,000.   He also owned a pair of mules, some farming implements, household and kitchen furniture and had $300 in bank.   He had been married to his wife thirty-four years, but they had no children.   His nearest relative was a half brother, in business for himself, and in no way dependent upon Wiley.   His wife was a faithful, frugal wife and carefully managed her household affairs.   A few years after their marriage he purchased this small tract of land upon which they resided and which he managed and cultivated till the time of his death on December 26, 1924.   Some three or four years before his death he became acquainted with the plaintiff in error, Pattie V. Forehand.   She and her husband were frequent visitors at his house, and he often visited her at her home.   For some reason, not disclosed by the record, he seems to have become infatuated with her, and was greatly solicitous about her at a time when she had a spell of sickness, and employed and paid his own doctor to attend her.   On June 12, 1924, he executed a will by which he devised his whole estate, except a pair of mules, to the said Pattie V. Forehand, subject to an annuity of $200 per year in favor of his wife, which was charged upon the land.   The will further provided, "and likewise said Pattie V. Forehand shall pay any necessary doctor's bills of my said wife and reasonable burial expenses of my said wife."   This will was admitted to probate *ex parte* by the clerk of the Circuit Court of Norfolk county, and from that order an appeal was taken to said circuit court by the widow and half brother.   On the appeal, the will was assailed on the ground of undue influence and the lack of mental capacity.   There was a trial before the court and a jury, and a verdict and judgment against the validity of the will, and to that judgment a writ of error was awarded by one of the judges of this court.

In 1921 the testator fell from a run-away wagon, lighting on his head and shoulder, which caused unconsciousness for about half an hour and injured his shoulder temporarily.

The testator made a number of wills. In 1898 he made a will by which he gave his whole estate, real and personal, to his wife. In the spring of 1924 he executed a will by which he gave "all of his real estate to his widow, Mrs. Ida Sawyer, as long as she lived, and after that time to the Baptist Orphan Asylum at Salem, Virginia." About two weeks thereafter he came to the scrivener and stated that the former will did not suit him, and requested him to prepare another will, which was done. In this draft he had the name of the beneficiary left blank. He declined to tell the scrivener the name of the beneficiary. "He said he would have that put in later." On April 19, 1924, he gave directions to an acquaintance to prepare another will. This was done and on the following day he returned and the will was read over to him two or three times, and explained to him, and he approved it and executed it in the presence of two witnesses. He gave the directions for the preparation of this will. The second, third, fourth and fifth clauses of this will were as follows:

"Second: I loan to my beloved wife, Ida W. Sawyer, for her support and maintenance during her natural life, all of my estate, both real and personal, after the payment of my debts as aforesaid.

"Third: After the death of my wife, Ida W. Sawyer, I give my estate, both real and personal, to my friend, Pattie V. Forehand, to be free and clear of incumbrances and without being molested by anyone whomsoever.

"Fourth: My beneficiary, Prattie V. Forehand, and executor hereinafter named are to pay out of the estate any debts, doctor's bills and burial expenses of my wife above mentioned.

"Fifth:   I nominate and appoint my friend, Pattie V. Forehand, to be my sole executor of this my last will and testament."

This will appears to have been delivered by the testator to Mrs. Forehand, who took it to her lawyer, Mr. Jas. G. Martin, for inspection and advice, and he suggested a change which resulted in the execution of the will in controversy, dated June 12, 1924, which is copied in the margin.[1]

Mr. Jas. G. Martin, the draftsman of the will, stands high at the bar, and in point of integrity of character no man stands higher.  He only knew the testator in connection with the drawing of the will of June 12, 1924.  A week or ten days before the will was drawn, Mrs. Forehand, for whom he had previously attended to some business, came to his office and showed him the will of April 19, 1924, and asked his opinion about it.  He testified that "Mrs. Fore-

[1] "In the name of God, Amen.   I, Wiley Sawyer, of the county of Norfolk, in the State of Virginia, do make, publish and declare this my last will and testament, hereby revoking all wills by me heretofore made.

"1.   I direct that my body shall be decently buried and that my just debts shall be promptly paid by my executrix.

"2.   I will, devise and bequeath all my property of every kind to my friend, Pattie V. Forehand, absolutely and in fee simple; except that I bequeath my pair of mules to my wife, Ida W. Sawyer; and except that said Pattie V. Forehand shall regularly pay to my said wife $200.00 each year on the first day of each January after my death so long as my said wife shall live only, and these payments shall be a charge against all my real estate which I may leave; and likewise said Pattie V. Forehand shall pay any necessary doctor's bills of my said wife and reasonable burial expenses of my said wife.

"3.   I appoint said Pattie V. Forehand my executrix.

"In testimony whereof I have hereunto set my hand this 12th day of June, 1924.

his<br>
"WILEY X SAWYER.<br>
mark

"Signed, published and declared by the testator, Wiley Sawyer, as and for his last will and testament in the presence of all of us present together with the testator and each other; and in his presence and in the presence of each other, all present together at the same time with the testator, we have at his request hereunto subscribed our names as witnesses.

"HUGH JOHNSTON.<br>
"A. A. WENDEL.<br>
"V. C. RANDALL."

hand asked my opinion as to this will in which she was the main beneficiary. I told her I thought there was a very unsatisfactory clause in the fourth paragraph which read as follows: 'My beneficiary, Pattie V. Forehand, and executor hereinafter named are to pay out of the estate any debts, doctor's bills and burial expenses of my wife above mentioned.' I told her that 'any debts' would allow the widow to make any debts she wished, no matter how large or unreasonable, and I didn't think that was a very good clause. She told me—she took this will away with her then and told me she was going. to speak to Mr. Sawyer about it. In—on the 10th day of June—she also said she knew Mr. Sawyer was willing to arrange that clause. On the 10th day of June Mr. Sawyer came to my office in company with Mrs. Forehand. It was then stated that instead of changing the clause I had referred to by putting some limit on the debts, that he wished to make a will to the effect of the will I drew in which he was to give a definite amount of money to his wife every year and a pair of mules. I explained to Mr. Sawyer that his widow, his wife, would have a right to renounce the will if she saw fit; that the law gave her a right to say she would not take under the will, but to take what the law allowed her which is commonly known as the 'widow's third.' He desired me to draw the will in this way. He could not write his own signature but had to sign by a mark. I asked him if he knew anybody around the law building, where my office is in Norfolk, to identify him as to his mark since his handwriting could not identify him, and he didn't know anybody handy. He said he knew plenty of people in Norfolk county, including Mr. Hugh Johnston and the sheriff over here. I told him I thought they would be excellent

witnesses, that I had to try a case over here two days later, on the 12th of the month, and if he would come back to my office early on the 12th I would then have the will ready for him and go over it with him, and if he approved it, after I had drawn it in type, we would come over here before court opened and have witnesses over here be witnesses to the will.   On the 12th of June, at something like nine o'clock in the morning, he and Mrs. Forehand came back to my office, at which time I had this will all prepared.   I read it over to Mr. Sawyer and he approved it in all respects.   I told him they could go on over here to the county and I would follow them very shortly, as soon as I got through with something I had in the office, perhaps getting ready for the trial of the case I had that day, and I came over to the county.   I am not sure whether I met Mr. Sawyer out in front of the clerk's office, but I met him over here close by, and we came up into this court room and Mr. Hugh Johnston, Sheriff Wendel, the testator, myself and the deputy clerk, Mr. Randall, to the best of my recollection, were the only people in the court room.   It was before the crowd had come to hear the trial of the case. I then came over to the end of this very table (indicating) and read the will over to him.   Mr. Sawyer approved the will and Mr. Hugh Johnston, by his direction, signed the name 'Wiley Sawyer, his mark,' in Hugh Johnston's handwriting here (indicating), and the other two witnesses, Mr. Wendell and Mr. Randall, signed as witnesses in my presence and in the presence of the testator."

Mr. Martin further testified in chief as follows:

"Q. Mr. Martin, when Mr. Sawyer came to your office on the 10th of June, as related by you, and went over with you the material—what was to be put in

the will, did he indicate by his speech, manner, or action that he was anything but normal in his mind?

"A. He did not. He was entirely in possession of all of his faculties. He had quite an active mind, as far as I could tell. I always, in drawing a will, try to ascertain two things. I satisfy myself as to whether the testator is of sound mind and whether he is acting of his own free will. I was convinced on both of those subjects that he was all right.

"Q. He gave you the information and instructions on the 10th and then on the 12th returned to your office at which time and place the will that you drew was read over to him. Was that will drawn according to his instructions?

"A. It was, sir. This is a carbon copy. I ought to use the original, I reckon, if you will hand me the original. I kept the carbon in my file. This clause: 'and these payments shall be a charge against all my real estate which I may leave.' I don't think he told me to make that a charge in the first conversation, but I merely put it in to make it state that the $200.00 would have to be paid and the legal way to carry it out was to make it a charge, and I put it in as a charge to bind the real estate for the payments.

"Q. It was security for Mrs. Sawyer?

"A. Security that the will would have to be carried out absolutely as written.

"Q. Now, at the time, on the 12th day of June, can you say whether or not Mr. Sawyer acted normally as regards his mental activity?

"A. He acted entirely normally and entirely intelligently.

"Q. Can you say to the jury whether, on the 10th or the 12th and at the time he came here to acknowledge his will, that he at any time exhibited to you or in your presence anything but a normal mind?

"A. He never did. If he had I would have hesitated to draw the will. I didn't hesitate at all because he was perfectly all right as far as I could tell.

"Q. Could you tell the age, or do you know the age, of Mr. Sawyer?

"A. I don't know the age. I would guess he was about sixty. I have heard since he was sixty-one, but I don't know his age.

"Q. Was he a feeble, decrepit old man, or to the contrary?

"A. The times I saw him, which was on those two days, he impressed me as a wiry, active kind of fellow.

"Q. When you came over here you said you read the will in the presence of these three witnesses. Did Mr. Sawyer acknowledge the will as being his last will and testament?

"A. He did, in the regular, ordinary, legal course.

"Q. Were all three witnesses present together with Mr. Sawyer and did he indicate his desire to have them witness the will?

"A. They were, and he did that there in this room.

"Q. Everything was done regularly and according to law?

"A. Yes; and I made my usual memorandum on my file which I have here if anybody wants to see it.

"Q. Mr. Martin, at the time that Mr. Sawyer was in this court house and acknowledged and signed his will by his mark, was Mrs. Forehand present?

"A. I don't believe she ever came into the court room. I don't recall her being in this room at all.

"Q. On the 10th of June and the 12th of June, at the times you say Mr. Sawyer and Mrs. Forehand came into your office, did she indicate either by speech or action a desire or purpose to direct his mind at his doing anything that he should not do?

"A. She didn't.   He acted entirely freely."

No material change in this testimony was elicited on the cross-examination, though the following questions and answers throw light on the preparation of the will:

"Q. Tell me why the question of specifically giving the mules to Mrs. Sawyer arose?

"A. It merely arose because I was directed to put it that way.   Why he wanted to give them to her I don't know.

"Q. Was anything said about the farm implements, wagons, poultry and stock, household furniture and what not?

"A. No, sir.

"Q. Just these two mules?

"A. Just the two mules and $200.00

"Q. Did it occur to you that Mrs. Sawyer would have little use for the two mules if the farm was taken away from her?

"A. I didn't consider that.   I am not sure of this, but I think the old gentleman stated that she could not handle the farm very well.   I would not swear to that absolutely because I am not quite clear on that.

"Q. I suppose Mrs. Forehand did most of the talking in your office?

"A. I don't think so.   I think they came entirely in a friendly way—

"Q. I know it.

"A. And did what you would expect normal people together, both talking.

"Q. Isn't it a fact that Mr. Sawyer had very little to say?

"A. I think he said all I would expect any man making a will to say?

"Q. And just answered 'yes' and 'no' in your presence?

"A. He did more than that. He directed me how to draw the will. I would not have drawn it in that way if he had not wanted it done."

It developed afterwards that his wife had loaned him the money with which to purchase the mules.

The three subscribing witnesses testified to the due execution of the will and that Mr. Martin was present at the same time, and that they did not think anyone else was present in the room at that time. They had no recollection of anything that was said or done by the testator, and the only one of them to whom the question was asked said he did not know whether or not the will was then read, but would not doubt it if Mr. Martin said that it was. He did most of the talking. They saw nothing abnormal about the testator, and would not have subscribed as witnesses if they had any suspicion that he was of unsound mind.

Dr. L. L. Sawyer, the family physician, testified that the testator had Bright's disease for several years prior to his death, but that he attended to his business and worked his land, and that prior to his last illness, three or four weeks before his death, he was in a fair mental condition, by which he meant that "he would come to me and talk on and tell me what he wanted, and if his wife was sick he would tell me how she felt and wanted me to go to see her." He acted in a rational and sane way.

Dr. Burfoot never attended the testator except in November, 1921, when he fell off the wagon and got hurt, and was unconscious for about half an hour. He saw him the next day and "he gave no indication that his mind had been affected by the blow." The real trouble was a fracture of the spinus process on the shoulder blade, for which alone Dr. Burfoot treated him, but did not see him after the second day, as he wanted Dr. Sawyer.

Dr. Eason, a witness for the contestants, had known the testator for upwards of thirty years, but had not seen him for probably a year before his death. Dr. Eason was first consulted by the testator on December 6, 1924, and found the testator in the last stages of Bright's disease. He sent him to bed and was called in again on December 16, 1924. The testator's mind was not then normal and he died December 26, 1924. The testimony of Dr. Eason throws no light on the condition of the testator's mind in June, 1924.

In addition to the witnesses mentioned, a number of neighbors and acquaintances were examined on both sides. This testimony was conflicting.

Looking only to the testimony of lay witnesses for the contestants, we find it of but little weight or value. The will was regarded by them not only as an unnatural will, but as an unlawful will—that a man had no right to make a will in favor of a stranger to the detriment of his wife—and the friends and neighbors of the widow began to reflect and recall every word and act of the testator that in their opinion showed that he was not mentally sound. These witnesses were permitted to testify as to words and conduct of the testator, and to give their opinion based thereon as to his mental condition. None of them testify directly that he was mentally incompetent to make a will, but think he was "not just right," or that there was something the matter with him, or equivalent expressions, meaning, however, that he was incompetent. A witness who wrote one of the earlier wills and *attested its execution,* "had been noticing him for a couple of years and he had never been exactly right since" he fell off the wagon. Another witness who was one of the attesting witnesses to the will of April 19, 1924, thought he was incompetent, though the

other attesting witness, who drew the will, testified to his competency in the fullest and most satisfactory manner. Another witness, who had known him and been brought in frequent contact with him, thought he was "very peculiar" and easily took offense. "He seemed to be very sensitive and very peculiar, but other than that I don't know anything." Other witnesses thought he was unbalanced because he made too many wills, or acted "kind of funny," or called people bad names, was formerly opposed to "smutty jokes," but in later years approved them and even told them; had his name taken off the church roll and would give no reason for it; in late years was cruel to a mule he worked, was snappy and cross with his wife and at times cursed her; he seemed to be "carried away with Mrs. Forehand," solicitous about her when sick, and paid her doctor's bills. Other similar, but not more cogent, reasons were assigned. How little these witnesses really knew, and how much they imagined, is well illustrated by the following extract from the testimony of one of the witnesses:

"Q. You say from his actions you imagined he was not himself. What were those actions?

"A. Well; one was in the different wills I heard he had made.

"Q. What?

"A. One was the different wills he made showed that the man was wrong somewhere mentally, to my mind. I may be wrong.

"Q. What other things did he say?

"A. I don't know that I could especially notice— mention anything.

"Q. Did you observe he was physically very feeble?

"A. Yes, sir.

"Q. What did you observe about his physical condition?

"A. I just imagined he was not the same man he was. He was gradually growing weaker.

"Q. What do you mean by 'just imagined'? Could you see it or not see it?

"A. I imagined I could see it.

"The court: Are you through with the witness?

"Mr. Eason: I want to pursue it until I get a reasonable answer.

"The court: Ask him the question.

"Mr. Eason: If he would just get away from the word 'imagine.'

"By Mr. Eason:

"Q. What do you know?

"A. If I said what I really knew I don't know that I really know anything."

His half brother testified that he was gradually "going down all the time and getting worse and worse" for the last two years; that he often complained of his head and at times threatened to kill himself, and that "he didn't have no mind." His testimony is too lengthy to give in detail, but furnishes no more satisfactory reason for his conclusions than that of other witnesses. Nor is the testimony of the widow much better. The latter testified that "he would go around in deep studies and sit around in the room with his face in his hands and get in these moods." She also testified that she loaned him $500 to pay for the mules which were worked on the farm, and that the income from the farm was sometimes more than $200 a year and sometimes less. She testified that "he was not in his right mind all the time," and reiterates her statement about his "spells" of headache, their apparent effect on his mind and her treatment. With reference to the relations of her husband with Mrs. Forehand, she testified as follows: "Tell us who you

think he was fond of?    He was fond of Mrs. Fore-
hand, wasn't he?

"A. That was the very one.    She stepped right in
between me and my husband."

The testator attended to his own business up to
the time of his death.    No committee was ever ap-
pointed to take charge of his estate, nor does the
record disclose that the testator had the reputation
of being of unsound mind, or that his sanity was ever
the subject of comment, or that any of the witnesses
for the contestants, prior to the death of the testator,
ever discussed with each other, or disclosed to each
other or to the contestants, the facts to which they
have testified.

The testator was an uneducated man, and could
not read or write.

The record discloses no evidence of any undue
influence exercised by Mrs. Forehand over the testator.
Her whole connection with the will, so far as disclosed
by the record, is shown by the testimony of Jas. G.
Martin, hereinbefore recited, and is not of sufficient
importance to justify a discussion of the subject of
undue influence.    This leaves as the only question for
discussion the mental capacity of the testator.

The will is an unnatural will, not such an one as
might reasonably have been expected of a husband
with an aged and dependent wife, and no descendants,
and this is a fact relevant to the question of testa-
mentary capacity, but not of itself sufficient to estab-
lish such incapacity.    When once the capacity of the
testator has been established, his will must stand as
the reason for his action.    Be he wise or unwise, he
is the disposer of his own property.    Neither old age,
partial loss of memory, eccentricities, sensitiveness,
high temper, the exhibition of passion on small provo-

cation, angry words towards a dutiful wife, nor all of these combined, are sufficient of themselves to prove incapacity to make a will. A testator is under no legal obligation to will his property to his wife or to any other person, and the justice or propriety of his will is not a question for the consideration of the jury except as a circumstance bearing on his mental capacity. If he was mentally competent, he had the right to dispose of his property as he chose, regardless of the opinion of others. *Huff* v. *Welch,* 115 Va. 74, 78 S. E. 573.

The circumstances of this case appeal strongly to our sympathy, as they did to that of the jury, but the hardships of a particular case cannot be permitted to overturn fixed principles of law established for the general good of society, and which are necessary guides for future conduct.

[1] Lay witnesses who have observed the testator in his lifetime may state facts which came under their observation, and may give their opinions based upon the data observed as to the mental capacity of the testator. *Fishburne* v. *Ferguson,* 84 Va. 87, 106, 4 S. E. 575; *Cropp* v. *Cropp,* 88 Va. 753, 759, 14 S. E. 529; *Whitelaw* v. *Sims,* 90 Va. 588, 19 S. E. 113. But frequently, as in the instant case, the data observed do not warrant the opinions expressed, and where that is the case, the opinions are of little, if any, value on the question of mental capacity. The observation is generally not very close, and the resulting impression usually passes out of the mind of the observer till recalled by some subsequent act of the party observed. Such testimony is entitled to but little weight. *Howard* v. *Howard,* 112 Va. 566, 570, 72 S. E. 133.

[2, 3, 4] On the other hand, the testimony of those present at the *factum*—when the will is executed—is

entitled to the greatest consideration. The time at which a will is executed is the vital time for mental capacity to exist. If it appears that the testator had mental capacity at that time, it is immaterial what his mental condition was before or after that time. Testimony on the subject of prior or subsequent incapacity is only relevant as tending to· show incapacity at the time of execution. It is for this reason that so much importance is attached to the testimony of those who were present at the *factum*. Usually, this weight is attached to the testimony of the subscribing witnesses called by the testator, or with his assent, to witness the will, but if they had no previous acquaintance with the testator, were not selected by him, and nothing was said or done by him at the time to indicate his then mental condition, it is said that their testimony is not accorded the weight which would otherwise attach to it. *Tucker* v. *Sandidge*, 85 Va. 546, 8 S. E. 650; *Chappell* v. *Trent*, 90 Va. 49, 19 S. E. 314. The testimony, however, of a reputable attorney who receives the instructions for drafting the will, drafts it, reads it over and explains it to the testator, and is present at its execution, is entitled to very great consideration as to the mental capacity of the testator. This is especially true in the absence of any suggestion of fraud, lack of memory or uncertainty as to what transpired, and when not in conflict with the testimony of the subscribing witnesses.

Two of the subscribing witnesses, Hugh Johnston and A. A. Wendel, the sheriff, were known to the testator and were suggested by him to Mr. Martin as witnesses to his will, and their presence was secured by Mr. Martin. It is true that little transpired in the way of conversation at the time the will was executed, as Mr. Martin did most of the talking, but they all concur in

the statement that there was nothing abnormal about the speech or actions of the testator at the time the will was executed, and that if they had observed anything of the kind they would not have attested the will. The testator was not a feeble, decrepit old man, but "a wiry, active kind of fellow," who had walked into the room to execute his will in apparent health and strength. He was produced as a competent testator, by Mr. Martin, a lawyer of high standing at the bar, whose reputation for integrity was such that they must have known that he would have scorned to practice a fraud on any one. Under these circumstances, great weight should be attached to the testimony of the subscribing witnesses who were men of prominence and standing in the community; one of them being a commissioner of the revenue in the county, another the sheriff, and the third a deputy clerk.

[5] The family physician of the testator also thought the testator was competent to make a will. It is said that great weight is always attached to the testimony of the family physician on the question of capacity to make a will. *Shacklett* v. *Roller*, 97 Va. 639, 34 S. E. 492.

No witness for the contestants testified that in his opinion the testator was not competent to make a will, nor does any one of them testify as to his mental condition on the day the will was executed. It may be said of the testimony for the contestants, as was said of similar testimony in *Howard* v. *Howard*, 112 Va. 566, 570, 72 S. E. 133, 134: "It consists of mere opinion of witnesses who have in the most transient and casual way seen the person whose mental capacity is assailed, and whose conclusions with respect to the subject of enquiry rests upon no substantial basis. The testimony of witnesses who were present at the *factum* is more to be relied on than the opinion of other witnesses based

on facts, which may be proven and yet not be the result of unsoundness of mind. *Beverly* v. *Walden*, 20 Gratt. 147; *Porter* v. *Porter*, 89 Va. 118, 15 S. E. 500."

The same conclusion is arrived at, upon similar testimony, in *Wampler* v. *Harrell*, 112 Va. 635, 72 S. E. 135, and *Wooddy* v. *Taylor*, 114 Va. 737, 77 S. E. 498. In the latter case there was a demurrer to the evidence by the proponents of the will, which was sustained.

*Huff* v. *Welch*, 115 Va. 74, 78 S. E. 513, was heard in this court "as upon a demurrer to the evidence;" the appeal being by the proponent of the will. It cites, and quotes from, with approval, the last three mentioned cases. The facts were similar, in many respects, to the facts in the instant case, and the verdict against the will was set aside as "a plain and palpable deviation from the proof in the case."

In the instant case the will is apparently a very unnatural one, and this is the strongest evidence against it, but outside of this the evidence of testamentary incapacity is very weak. We say the will is *apparently* an unnatural one, but it may be that the testator thought that an annuity of $200 a year, and doctor's bills and funeral expenses were worth more to his wife, at her advanced age, than a life estate would be, especially in view of what his widow testified that they realized from the land. He also provides for the return to her of the mules for which she had advanced the purchase price. The latter provision shows that he had in mind, when directing the preparation of his will, the obligation to refund this sum to his wife. This was of itself some evidence of testamentary capacity.

[6] We attach little, if any, weight to testimony of two subscribing witnesses to former wills impeaching the mental capacity of the testator at the time they subscribed. Such testimony is always viewed with

suspicion. *Young* v. *Barner*, 27 Gratt. (68 Va.) 96; *Lambert* v. *Cooper*, 29 Gratt. (70 Va.) 611; *Cheatham* v. *Hatcher*, 30 Gratt. (71 Va.) 56, 32 Am. Rep. 650.

There is no suggestion of *senile dementia*. The testator died of Bright's disease, but the testimony of the contestants was directed chiefly to the supposed effect of the fall from the wagon in 1921, when the testator was rendered unconscious for half an hour. This was sought to be connected with the Bright's disease, but we think unsuccessfully. Dr. Eason, who testified for the contestants, was not called to see the testator till December 6, 1924, when the testator was in the last stages of Bright's disease. He died December 26, 1924. He was probably not capable of making a will between these dates, but Dr. Eason knew nothing of his mental condition in June, 1924, when the will was executed.

[7] The witnesses present at the execution of the will of June 12, 1924, established clearly and plainly the mental capacity of the testator at that time, and this testimony is not contradicted except by inferences drawn from testimony of little value in itself.

The verdict of the jury finding against the validity of the will is plainly contrary to the evidence. The judgment of the trial court will, therefore, be reversed, the verdict of the jury set aside, and the case remanded to the trial court with directions to admit to probate the will in the proceedings mentioned, signed by Wiley Sawyer, bearing date June 12, 1924, as the true last will and testament of said Wiley Sawyer. The plaintiff in error will also be given a judgment for her costs.

*Reversed and remanded.*