POLLY ADAIR FLOYD

*v.*

THEODORE FLOYD, *etc., et al.*

(No. 12205)

Submitted September 24, 1963. Decided December 17, 1963.

184

*Lafe P. Ward,* for appellants.

*Ersel L. Slater, Harry W. Hill,* for appellee.

BERRY, PRESIDENT:

This action was instituted in the Circuit Court of Mingo County by Polly Adair Floyd against Theodore Floyd, in his own right, and as executor of the last will and testament of Albert Rush Floyd, who died on February 8, 1961, and Sinda Floyd, Theodore's wife, under the provisions of Code, 41-5-11, to impeach a writing purported to be the

last will and testament of Albert Rush Floyd dated January 21, 1961, and admitted to probate in the office of the county clerk of Mingo County on February 15, 1961. The plaintiff's complaint and amended complaint attacked said purported last will and testament on the ground that it was obtained by undue influence exerted upon Albert Rush Floyd by the defendants, Theodore and Sinda Floyd. The defendants in their answer moved that third parties, who were the alleged heirs of one Henry Floyd, now deceased, be made defendants to this action. Henry Floyd, the father of Theodore Floyd and the third party defendants covered by the motion contained in defendant's answer, was the alleged illegitimate son of Albert Rush Floyd. The motion to bring in said third party defendants was overruled by the trial court. The defendants by their answer denied the material allegation of the complaint and a trial by jury was had on the issue of *devisavit vel non* after which the jury rendered a verdict on October 25, 1961, finding that the paper writing in question was not the last will and testament of Albert Rush Floyd. On application to this Court by the defendants, an appeal and supersedeas was granted on December 10, 1962, from a judgment contained in a *nunc pro tunc* order entered by the Circuit Court of Mingo County on January 17, 1962. The case was submitted on arguments and briefs to this Court at the September, 1963, Term.

The errors assigned in this Court by the appellants, defendants below, are: (1) The admission of improper evidence during the trial, (2) the giving of improper instructions and the refusal to give proper instructions, and, (3) that the verdict of the jury is contrary to the law and evidence and should have been set aside and a new trial granted.

A matter contained in and running through all of the assignments of error relating to improper evidence introduced during the trial and to improper instructions given to the court based on such evidence, must first be answered before any other matters can be dealt with in this case.

It is the contention of the defendants that the complaint filed by the plaintiff is based solely on the ground that undue influence was used in procuring the will in question and that any evidence introduced by the defendants and any instructions based on the mental capacity, or lack thereof, of Albert Rush Floyd, were improper. However, it is to be noted that not only did both the plaintiff and defendants introduce such evidence relating to the mental capacity of Albert Rush Floyd, but that the proponents of the will, the defendants in this proceeding, introduced such evidence first in order to establish the validity of the will.

Albert Rush Floyd was eighty-six years of age at the time of his death on February 8, 1961. He had lived most of his married life on a small farm on Millstone Branch of Pigeon Creek in Mingo County, West Virginia. He married the plaintiff in 1903, and they lived together in an apparently harmonious manner on the small farm for almost sixty years. The entire amount of the estate of Albert Rush Floyd which is involved in this controversy is approximately $7500.00.

In August, 1960, Albert Rush Floyd consulted a physician in Williamson, West Virginia, and was advised that he had an inoperable cancer of the rectum. Drugs for the relief of pain were prescribed for him and in December, 1960, he spent a day or two in a hospital in Williamson, after which he returned home where he was soon thereafter confined to his bed. He was not attended by any physician after his return to his home in December, 1960, but was cared for by friends and relatives who apparently administered at various intervals the drugs which had been prescribed by the physician, the prescriptions being refilled from time to time. The drugs which were prescribed and administered were elixir of phenobarbital and demerol. The phenobarbital apparently failed to afford the relief desired and the demerol was constantly used for such relief during the last two months of his life. The records of the drug store where the drugs were obtained on prescriptions written by Dr. W. W. Scott disclosed that from December 12, 1960, until January 21, 1961,

the date the will in question was executed, eight 30 cc vials of demerol were obtained with instructions to administer one cc at a time for the relief of pain. No specific time for the administering of the drug was given, but there was evidence introduced during the trial which indicated that the drug was usually given at some four hour intervals. However, the exact frequency of the administering of these drugs is not certain, because the statute, Code, 57-3-1, as amended, prohibited most of the persons who administered the drugs from testifying.

During the illness of Albert Rush Floyd, his wife, who was, according to testimony, eighty-four years of age, but according to an exhibit was about eighty-one years of age, was also ill. Both were confined to beds in adjoining rooms, and the duty of caring for these two aged people rested upon Roach Mosley, a hired man, and was later assumed by Della Kirk, a niece of the plaintiff, and her husband, Ira, who lived nearby, from some time in December, 1960, until around the first of January, 1961. Della Kirk was reared from childhood by the plaintiff and her deceased husband. Both Della and her husband were employed in outside jobs during the time they were caring for this aged couple, she as a schoolteacher and he as a coal miner, thus imposing a great burden upon them. Their daughter, Polly, who was in nurses' training, cared for the elderly couple during her visit home during the Christmas holidays in 1960.

Around the first of January, Theodore and Sinda Floyd visited Albert Rush Floyd, and, perhaps due to the arduous burden on the Kirks, took over the care of the aged man and apparently endeared themselves to him by doing what he wanted them to do, advising him that they had complied with his requests, and also voluntarily doing what they thought might please him. It appears that Theodore was unemployed at this time and devoted his entire time to caring for Albert Rush Floyd, his purported grandfather. Albert Rush Floyd appears to have preferred the care rendered by Theodore and Sinda Floyd to that of the Kirks, and as a result, the Kirks ceased to render the assistance and care they had theretofore given.

Mrs. Kirk testified that Theodore and Sinda Floyd did everything they could to ingratiate themselves in the good graces of the old man, such as cleaning the barn, taking care of the stock and telling the aged man how well they had performed such work; that they also spent considerable time holding the old man's hands, rubbing his legs and talking with him for long periods of time. During this time the plaintiff occupied a separate room and apparently the door between the rooms was closed most of the time. The record indicates that Theodore Floyd's sister, Flora, was also present, along with Theodore and Sinda, rendering assistance to the old man.

Soon after Flora Floyd appeared on the scene, Albert Rush Floyd dictated to her instructions for the writing of a will. This instance occurred some time around January 10, 1961, and it was addressed "to some attorney at law", authorizing such attorney to write a will. The most interesting thing about this dictation was the fact that the testator dictated from memory a description of his land which corresponded quite accurately with a description of the property as filed in the office of the clerk of the county court of Mingo County in 1907. This paper, which was written by Flora, witnessed by her and Roach Mosley, provided apparently that certain money would go to the plaintiff which later was given to Theodore under the will in question, but both are essentially the same. Soon after Theodore and Sinda Floyd took over the duty of caring for Albert Rush Floyd, Theodore consulted a lawyer with regard to the preparation of a will for him. The will was drawn up by the lawyer and provided for a life estate to Polly Floyd, wife of Albert Rush Floyd, both in the real estate and household goods and personal effects owned by Albert Rush Floyd, with the remainder interest given to Theodore and Sinda Floyd at the death of Polly Floyd. Another provision of the will bequeathed all of his money, after the payments of his just debts, funeral and burial expenses and costs to Theodore Floyd, with a precatory request that Theodore Floyd pay the reasonable and suitable funeral and burial expenses of Polly at her death. The will also provided that in the event of Polly's death

before that of Albert Rush Floyd, then all of his property, both personal and real, be devised to both Theodore and Sinda Floyd in fee simple and absolutely. This is the substance of the will in question in this case.

The lawyer who prepared the will neither saw nor talked with Albert Rush Floyd as the Floyds lived in an isolated section and bad weather at the time the will was written made it difficult for him to visit them. After the will was written, Theodore Floyd took it with him and requested Robert Lee Hatfield, a justice of the peace, and W. B. Ferrell, a constable, to accompany him to the home of Albert Rush Floyd. Neither Hatfield nor Ferrell had any connection or relationship with Albert Rush Floyd although they had heard considerable information about him. When Theodore Floyd, Ferrell and Hatfield arrived at the Floyd home Roach Mosley was present. Before the will was executed, Lee Hatfield read it, item by item, to the testator, who, so Hatfield testified, stated that that was the way he wanted his property to be disposed of in each instance, and who then signed the will which was witnessed by Roach Mosley and W. B. Ferrell. The two witnesses to the will and the justice of the peace testified that Albert Rush Floyd was mentally alert, in good spirits and knew exactly what he was doing at the time the will was read to him, signed, and witnessed. It is further indicated by their testimony that he talked with them for about one-half hour before going into a discussion of the will, and conversed about the background of both the constable and the justice of the peace and the fact that he had known their relatives. The testimony of these witnesses is clear and positive with regard to the due execution of the will and the proper mental condition of the testator at the time of the execution. No indication whatsoever of any undue influence was present at that time. There were no other witnesses who testified in this case in the trial court who were present in the Floyd home at the time and place of the execution of the will. The justice of the peace also, after the formalizing of the will, took the jurat of the witnesses to an affidavit, as to the due and proper execution thereof, all of which was done on January 21, 1961, with

all parties present together. At the time the will was signed it was necessary that Albert Rush Floyd be propped up in bed in order for him to be able to sign it; and after the signing of the will, he dictated a paper intended as a power of attorney which gave Theodore Floyd control over his deposit box after his death. This paper was also witnessed by Ferrell and Mosley and a jurat was executed by Hatfield.

After the defendants, the proponents of the will in question, had proved the due execution thereof and had clearly met the burden imposed upon them in this connection, the plaintiff then introduced numerous witnesses who had known Albert Rush Floyd during his lifetime, most of whom apparently were friends or relatives of the plaintiff or the Kirks. All of these witnesses testified relative to the mental capacity of Albert Rush Floyd during his last illness, either before or after the will was executed. There was no direct evidence introduced at any time during the trial as to any undue influence being exerted upon Albert Rush Floyd. The evidence was to the effect that Albert Rush Floyd had a strong mind and will but that his mental capacity had been materially weakened during his last illness. J. A. Maynard, Sr., who visited the said Albert Rush Floyd on or near January 15, 1961, stated that, "He seemed to be in a stupor and his mind came and went". This witness apparently was rather versatile because he was an accountant, insurance man and a minister of the gospel. It appears that he also wrote wills for Albert Rush Floyd and Polly Adair Floyd in September or October, 1960. These wills which were not introduced into evidence conveyed all of the property of each to the other in case of their death but in case they died at the same time all of their property was conveyed or bequeathed to Della and Ira Kirk. It is not entirely clear, but it appears that Polly Adair Floyd had some property of her own, either real estate or bonds, or both.

Other witnesses testified on behalf of the plaintiff that they had seen Albert Rush Floyd in December which was before the will was executed and that he did not recognize them. Others testified that they had seen him early

in January just before the will was executed and that he did not know what he was talking about. Dr. W. W. Scott who diagnosed the condition of Albert Rush Floyd in the fall of 1960 testified that the taking of demerol as prescribed by him for Mr. Floyd would make him drowsy and sleepy but that the full effect of the drug would perhaps last for only an hour or so and would gradually wear off. Polly Kirk testified that Mr. Floyd would beg her for the shots of demerol, that after the shots had been given he would become "real drowsy and sleepy", and that before she left early in January to return for the completion of her nurses' training there was a retrogression in his condition. One of the plaintiff's witnesses, Frank Totten, who visited Mr. Floyd during the middle of January stated that he was lifeless and could not transact any business. This answer was in response to a question as to his opinion as to whether or not he could transact any business although there was no attempt made by this witness to transact any business with the ill man. He also testified that he visited Mr. Floyd the latter part of January and the first part of February and that he was not active mentally. Troy Floyd, Sr., a double first cousin of Albert Rush Floyd, testified that he visited him at frequent intervals from December until he died and that Mr. Floyd was usually propped up in bed and at times he "acted reasonably well". Frank J. Burian, a physician who had neither treated nor seen Mr. Floyd, testified in answer to a hypothetical question that if Mr. Floyd had been given the demerol or drugs prescribed that he was not mentally competent to execute a will. He also testified that because Mr. Floyd had cancer, "He probably had been mentally incompetent ever since he started taking his demerol". Other witnesses testified that Mr. Floyd appeared to be under sedation when they visited him.

Upon completion of the plaintiff's evidence relative to the mental condition of Albert Rush Floyd, the defendants introduced into rebuttal many witnesses who testified positively that the mental condition of Albert Rush Floyd in and around the time the will in question was executed was good, that his mind was clear and that he dis-

cussed business matters in detail with various people and knew exactly what he was doing. Among the witnesses who testified was Jim Crum who had leased a small coal mine near his home. Mr. Crum stated that he saw Albert Rush Floyd every three or four days and paid royalties to him in connection with the mining of coal. He further stated that there was nothing wrong with his mind and that he always recognized him. This witness was not related to any of the parties involved. Homer Hunter rented a house owned by Mr. Floyd and saw him a few days before the will was executed in January but observed nothing wrong with his mind when they discussed in detail the method of paying back rent to Mr. Floyd. It was suggested that a judgment be obtained and that his wages be garnisheed in order to pay the back rent. Sid Hunt who worked for Mr. Crum hauling coal also rented a house from Mr. Floyd. He discussed arrangements with regard to paying the rent and testified that Mr. Floyd's mind was clear during such discussion. George Farley who had known Mr. Floyd all of his life visited him several times during December and January and stated that his mind was as good as ever. Leander Fouch had known Mr. Floyd all of his life and visited him in December and January. He also testified that his mind was as clear as it had even been. Floyd Farley who hauled coal near the Floyd home visited Mr. Floyd frequently during December and January up until the time he died. He testified that Mr. Floyd always recognized him, that he conducted conversations with him and that his mentality was as good as it had ever been. It appears from the evidence that Mr. and Mrs. Marcum are now living in the home of Albert Rush Floyd but that the plaintiff, who is living in the home of Della and Ira Kirk, will not accept rent which has been offered to her because of the controversy over the will although in any event the plaintiff would be entitled to the rent. Evidence was introduced by the plaintiff during the trial of the case with regard to the value of the property owned by Albert Rush Floyd which was objected to by the defendants. The plaintiff also objected to the instruction given to the jury by the trial court as to the disposition of the property by descent and distribu-

tion which would vest in the plaintiff if the will was not upheld.

The contention of the defendants that the mental capacity of Albert Rush Floyd was not raised in the pleading and therefore should not have been considered in the trial of this case is without merit. The amended complaint of the plaintiff contains an allegation relative to the mental condition of Albert Rush Floyd and evidence was submitted on this question by both the plaintiff and the defendants. Under both the old procedure and the new procedure this issue was proper for submission in the case at bar and under the new rule the pleadings could have been amended at any time if it had been deemed necessary; but even if the issue was not raised by the pleading but was tried as was done in this case by the consent of the parties, it would be treated in all respects as if it had been raised in the pleadings and the failure to amend would not affect the verdict. 14 M.J., Pleading, §67, Waiver; Rule 15 (b) R.C.P.; *Bank* v. *Bryan,* 72 W. Va., 29, 78 S. E. 400.

The assignment of error with regard to the admission of evidence relating to the value of the property of Albert Rush Floyd and the instruction to the jury by the Court with regard to the disposition of such property by the law of descent and distribution which was contained in the pleading was not error in the instant case because the will in question could be considered in the category of an unnatural will due to the fact that the plaintiff, the wife of the testator, at an age when it would be of little value, was left only a life estate, whereas, under the law of descent and distribution, there being no children, she would have received the entire estate. The value of the property involved would be proper evidence in this case where unnatural disposition is involved. 95 C.J.S., Wills, §474, page 472; *Tucker* v. *Sandidge,* 85 Va. 546, 8 S. E. 650; *In Re Maier's Estate,* (Iowa), 20 N. W. 2d 425; *Ebert* v. *Ebert,* 120 W. Va. 722, 200 S. E. 831. See *In Re McGowan's Will,* 235 N. C. 404, 70 S. E. 2d 189; *Tucker* v. *Houston,* (Ala.), 112 So. 360.

The above discussion covers the assignments of error relating to the instructions offered by the plaintiff with the exception of Instruction No. 1, offered by the plaintiff to which there was only a general objection made. Therefore, it is not necessary to discuss the assignment of error pertaining to such Instruction.

From the contents of the defendants' brief, it would appear that an attempt was made to assign as error in connection with the argument to the jury made by the attorney for the plaintiff that it was inflamatory and constituted prejudicial error. However, no objection was made to such argument and the trial court had no opportunity to rule thereon. Therefore, if any error was committed in this connection it was waived. *Given* v. *Diamond Shoe & Garment Co.,* 84 W. Va. 631, 101 S. E. 153; *Deitz* v. *County Court of Nicholas Co.,* 122 W. Va. 296, 8 S. E. 2d 884; *Yuncke* v. *Welker,* 128 W. Va. 299, 36 S. E. 2d 410.

As heretofore stated, there is no direct evidence in the instant case of any undue influence having been exerted on Albert Rush Floyd at any time by the defendants or anyone else. It is true that undue influence may be proved by circumstantial evidence, but to warrant the finding of undue influence from circumstantial evidence such proof must be consistent with the exercise of undue influence and inconsistent with any other theory than that of undue influence. Such undue influence cannot be based on suspicion, possibility or guess that such undue influence had been exercised but must be proved and the burden of proof of such issue rests on the party alleging it. *McMechen* v. *McMechen,* 17 W. Va. 683; *Kerr* v. *Lunsford,* 31 W. Va. 659, 8 S. E. 493; *Payne* v. *Payne,* 97 W. Va. 627, 125 S. E. 818; *Ebert* v. *Ebert, supra; Mullens* v. *Lilly,* 123 W. Va. 182, 13 S. E. 2d 634; *Ritz* v. *Kingdon,* 139 W. Va. 189, 79 S. E. 2d 123.

It is implied by the plaintiff that the kindness and attention rendered to the testator, Albert Rush Floyd, by the defendants constituted undue influence on the part of the principal devisees but this alone falls short of the proof required to show such influence. *Kerr* v. *Lunsford, su-*

*pra; Ritz* v. *Kingdon, supra.* Inasmuch as there is not sufficient evidence in the case at bar to warrant the jury's verdict of impeaching the will in question on the ground of undue influence, the only other proposition upon which the jury's verdict can be upheld would be lack of mental capacity on the part of Albert Rush Floyd to make the will in question on January 21, 1961. The burden of proving mental capacity is upon the proponents of the will, the defendants herein, but if such proof is clear and preponderating to such an extent that only one verdict can be rendered and the verdict is contrary to such evidence, then the verdict on proper motion should be set aside. *Forehand* v. *Sawyer,* 147 Va. 105, 136 S. E. 683; *Ritz* v. *Kingdon, supra.*

In determining the mental capacity of a testator to make a will, the time to be considered in connection therewith is the time the will was executed. *Kerr* v. *Lunsford, supra; Forehand* v. *Sawyer, supra; Montgomery* v. *Montgomery,* 147 W. Va. 449, 128 S. E. 2d 480, *Ritz* v. *Kingdon, supra.*

At the time the will in question was executed no clearer or more positive evidence could have been introduced than that in the instant case concerning the mental condition of the testator. The attesting witnesses and two other disinterested witnesses were present at such time and all of them stated that the testator's mind was clear, that he not only knew what he was doing but approved of every item contained in the will which was read to him verbatim by one of the disinterested witnesses.

The evidence of attesting witnesses is entitled to great weight. *Dower* v. *Church,* 21 W. Va. 23; *Kerr* v. *Lunsford, supra; Ritz* v. *Kingdon, supra.* However, it is not conclusive but must be clearly outweighed by other evidence. *Smith* v. *Ottley,* 144 Va. 406, 132 S. E. 512. No witnesses testified as to the mental capacity or lack thereof at the exact time the will in question was executed except witnesses for the proponents of the will, the defendants below. The testimony of an attending physician or the lawyer who drafted the will is also entitled to great weight on the

question of mental capacity. *Forehand* v. *Sawyers, supra; Ritz* v. *Kingdon, supra.* However, in the case at bar there was no attending physician who testified, nor did the lawyer who prepared the will testify. The plaintiff introduced witnesses who testified that at some time *before* the will was executed and at some time *after* the will was executed, in their opinion Albert Rush Floyd did not know what he was doing and therefore did not have the capacity to execute the will; but it is to be noted that at least one of the witnesses, Troy Floyd, Sr., a double first cousin of Albert Rush Floyd and who was about the same age as the testator, having known him all of his life, testified that he thought he acted reasonably well at times during his last illness. None of the witnesses who testified on behalf of the plaintiff carried on any business transactions with him and no such testimony apparently was available from any of the plaintiff's witnesses. However, witness after witness testified on behalf of the defendants that they talked with and discussed their business dealings in detail with the testator and that his mind was clear and he knew exactly what he was doing in connection therewith. All of this evidence was in addition to the evidence of the witnesses who testified on the due execution of the will signed on January 21, 1961, and covered periods of time before and after the will was executed.

Old age, illness and infirmities of the body are not sufficient to establish lack of capacity of a testator to make a will. *Kerr* v. *Lunsford, supra; Pritchard* v. *Pritchard,* 135 W. Va. 767, 65 S. E. 2d 65; *Ritz* v. *Kingdon, supra.* It requires less capacity to make a will than to make a deed. *Nicholas et al.* v. *Kershner et al.,* 20 W. Va. 251; *Kerr* v. *Lunsford, supra; Ritz* v. *Kingdon, supra.*

The evidence taken as a whole in the instant case clearly shows that Albert Rush Floyd had sufficient mental capacity at the time of the execution of the will in question to make a valid will and that consequently, the verdict of the jury is without sufficient evidence to support it and is against the clear preponderance of the evidence introduced during the trial of this case and should therefore be

set aside. *Palmer* v. *Magers,* 85 W. Va. 415, 102 S. E. 100; *Cannady* v. *Chestonia,* 106 W. Va. 254, 145 S. E. 390; *Ritz* v. *Kingdon, supra.* Upon a jury trial involving an issue of *devisavit vel non* a court may set aside the verdict the same as in any law action if the evidence so warrants. *Pritchard* v. *Pritchard, supra; Ebert* v. *Ebert, supra; Ritz* v. *Kingdon, supra.*

For the reasons stated herein, the judgment of the Circuit Court of Mingo County is reversed, the verdict of the jury is set aside, a new trial is awarded the defendants and the case is remanded to that Court for proceedings in conformity with the principles contained in this opinion.

> *Judgment reversed;*
> *verdict set aside;*
> *new trial awarded;*
> *case remanded.*